IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SABINO CANYON TOURS, INC.,<br>5900 N. Sabino Canyon Road,<br>Tucson, AZ 85750,<br><br>DONN RICKETTS,<br>542 North Chalet Avenue,<br>Tucson, AZ  85748<br><br>Plaintiffs,<br><br>v.<br><br>USDA FOREST SERVICE,<br>1400 Independence Avenue, S.W.,<br>Washington, DC 20250,<br><br>Defendant. | Case No. 17-cv-2758 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Sabino Canyon Tours, Inc. and Donn Ricketts (collectively "SCT"), by and through their undersigned attorney, complains of defendant as follows:

**INTRODUCTION AND SUMMARY**

1.      This complaint requests the Court to vacate and set aside unlawful, arbitrary and capricious agency action by the USDA Forest Service ("Forest Service") as described herein pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

2.      SCT is challenging the Forest Service's determination that SCT is incapable of meeting the public demands as called for in a current Prospectus issued by the Forest Service seeking an operator for the shuttle services in the Sabino Canyon Recreation Area in the Coronado National Forest ("Forest").  The Forest Service's erroneous decision is harmful and highly prejudicial to SCT.

3.      The decision regarding SCT's alleged inability was the basis for the Forest Service's subsequent decision to contradict 100+ years of its own policy and practice in implementing the Term Permit Act of 1915 and not issue SCT a permit to continue its longstanding and highly rated shuttle operations in the Sabino Canyon Recreation Area.  In reliance on this irrational decision and invalid interpretation of its regulations and policy directives which constitutes a complete reversal of the agency's longstanding interpretation of those authorities, the agency has decided to proceed with a competitive Prospectus to seek applicants to replace SCT as the operator of the shuttle service.  If the agency is allowed to continue with the prospectus process, the Forest Service's erroneous determination as to SCT's alleged inabilities also will preclude SCT from being fairly evaluated by the agency as an applicant pursuant to the Prospectus.

4.      The agency's decisions were based on its determination that SCT had shown it was incapable of meeting public demands by failing to obtain expensive new equipment for the shuttle operations during short length permits which SCT previously held for these services.  The agency's determination was unreasonable because, as discussed further below, (1) the agency had not made a decision as to which if any public demands it wanted SCT to address at the time of its determination and (2) the agency had also admitted that obtaining expensive new shuttle equipment, such as vehicles with alternative motor vehicle technology, was not feasible under SCT's short length permits.

5.      At the time the agency decided on May 31, 2017 that SCT had shown that it was unable to meet the public demands by failing to make changes to its shuttle operations, the Forest Service had not made a decision as to which specific public demands should be addressed through changes to the shuttle operations.

6.      As the record in this case shows, the agency had previously stated that it would determine

what changes were needed _after_ it completed its environmental assessment (EA) and made a

final decision based on that EA.  The final decision based on the EA was not made until

November 3, 2017.  The agency's determination that SCT had failed to make changes to its

operations in accord with this final decision, however, was incongruously made on May 31,

2017, over five months _before_ the final decision was made as to what those changes should be.

7.      Thus, the Forest Service could not rationally conclude as of May 31, 2017 that SCT had

shown it was incapable of meeting public demands by failing to implement changes that had not

yet been determined.

8.      In addition, the Forest Service's decision that SCT should have obtained new shuttle

equipment under the short length permits the agency had issued is directly contradicted by the

agency's prior admissions that the agency's own actions were the reason why SCT could not

purchase new equipment.

9.      The agency recognized that SCT wanted to purchase new equipment but that, due to its

high costs, the equipment could not be purchased unless the agency issued SCT a long term

permit which would allow the costs to be recovered.  The agency said that it would, but then

never did offer a long term permit to SCT which would allow SCT to make these purchases.

Thus, it was irrational for the agency to assert that SCT showed an inability to meet changing

public demands by failing to purchase new equipment under a short length permit when the

agency admitted this purchase was infeasible.

10.     The Forest Service used this erroneous determination to justify its decision to renege on

its written assurances to SCT that, pursuant to longstanding Forest Service policy and the terms

and goals of the Term Permit Act of 1915, 16 U.S.C., § 497, SCT would be given the

opportunity under a new long term permit to purchase new equipment for the shuttle operations in order to address identified public demands as required by the agency.

11.     The agency's decision not to issue SCT a new Term Permit but to instead conduct a competition to authorize the same operations under a five year permit was contrary to the Term Permit Act of 1915 as well as over 100 years of agency policy in implementing that Act.  The Term Permit Act of 1915 specifically authorizes the use of long term permits to allow permittees the ability to amortize funds needed to build and maintain privately owned improvements within National Forests required to provide high quality services to the public.  In fact, the agency had previously agreed that a long term permit was needed for the shuttle operations in order to amortize the cost of the new, advanced technology equipment it now has said it wants a permittee to use in its operations.  In addition, the Forest Service recognized in its EA the need for a 20 year permit for these services.  However, the agency then abruptly stated in its Prospectus that the new permit would only be for five years.

12.     The bases for the agency's decisions not to issue SCT a new Term Permit and to issue a Prospectus for a five year permit are contradicted by the record and are arbitrary, unreasonable, an abuse of any discretion the agency may have had and not in accordance with law.

13.     In addition, the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., when it asserted to the public in its EA that its final decision to authorize continue shuttle services would not result in any disturbance to the ground within the Sabino Canyon Recreation Area.  Before the Forest Service completed its EA analyzing the impacts of its proposed decision to continue with shuttle services in Sabino Canyon, the agency decided to issue a competitive Prospectus for the shuttle services.  That decision resulted in the proposed action having a likely chance of causing extensive ground disturbing activity because it

4

could result in the termination of the existing permit held by SCT without a reissuance of that permit.  Not reissuing SCT's permit would likely then require SCT to conduct an extensive amount of ground disturbing earthwork to remove its existing buildings and structures in the Sabino Canyon Recreation Area.

14.     The agency, however, made absolutely no reference to this likely significant environmental impact to the public as part of the NEPA process, nor did it ever evaluate the environmental impact of these ground disturbing activities before making its final decision. Instead, the agency misled the public by definitively stating that "no ground disturbing activities would occur" as a foreseeable result of its decision.

15.     The need to properly follow the NEPA process is particularly important in this instance because the agency itself has characterized Sabino Canyon Recreation Area, which borders the Pusch Ridge Wilderness Area, as being a unique desert environment based on its topography and climate.  The area provides habitat for many species of plants and animals, including the federally-listed Gila chub, Gila topminnow and Western yellow-billed cuckoo.  For these reasons, the Coronado National Forest considers Sabino Canyon to be the jewel of southeast Arizona.

16.     Therefore, the agency's misrepresentation to the public as to there being no chance of ground disturbing impacts to this unique desert environment as a result of its decision and its failure to assess the environmental impact of those ground disturbing activities under its EA was a clear and material violation of NEPA.

17.     Finally, if the Forest Service is allowed to proceed on its current agenda, the agency's unsupported and arbitrary written decision that SCT has already shown that it is incapable of meeting the requirements in and goals of the new Prospectus to address changing public

demands will obviously preclude SCT from being fairly evaluated or selected as an awardee in response to that Prospectus, notwithstanding the agency's purported claim that it will try to treat SCT fairly.  This outcome will result in SCT's dissolution because SCT and Mr. Ricketts have been solely focused on providing these shuttle services to the public for the past 32 years.  This outcome will obviously have irreparable harm to SCT.  This decision by the Forest Service must therefore be vacated and withdrawn.

18.     The Forest Service's decisions and actions were arbitrary, capricious, an abuse of any discretion it may have and not in accordance with law.  SCT is asking the Court to suspend the current Prospectus process, overturn the agency's invalid determinations and remand this matter to the agency to address these issues in accordance with the Court's ruling.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

21.     The Forest Service's written determination that SCT was unable to meet the public demands, which was made on August 15, 2017 and reaffirmed in writing numerous times by the Southwestern Regional Forester and again reaffirmed by the Deputy Chief of the Forest Service in her letter dated November 27, 2017, as well as the agency's Prospectus issued on November 28, 2017, were final agency actions within the meaning of 5 U.S.C. § 704.

22.     This Court has jurisdictional authority to review these final agency actions pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

23.     The Court also has the authority to issue the relief being sought, including declaratory and injunctive relief, pursuant to 28 U.S.C. § 2201, 2202 as well as the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

## PARTIES

24.     Plaintiff SCT is a corporation incorporated under the laws of the State of Arizona.  Its

principal place of business is in Tucson, Arizona and its President is Donn Ricketts.  SCT is the

current permittee authorized by the Forest Service to provide the shuttle services at issue in this

matter in the Sabino Canyon Recreation Area.

25.     Plaintiff Donn Ricketts is the owner and President of SCT.  Mr. Ricketts is a resident of

Tucson, a frequent visitor to Sabino Canyon Recreation Area and intends to frequently visit the

area in the future.

26.     Defendant USDA Forest Service is an agency within the United States Department of

Agriculture and its main offices are located in Washington, DC.

## FACTS

### *The prior operator*

27.     In 1978, the Forest Service first closed the road going through Sabino Canyon to private

vehicles and began authorizing a commercial shuttle service to take people up into the Canyon.

28.     The first shuttle operator, TWA Canteen Services, was unable to make the operation

economically viable, and informed the agency it wanted to leave.

29.     A second operator, Sabino Enterprises, Inc., then took over operations but also was

unable to make the operation economically viable.

30.     SCT then took over in 1985 and began the transformation of the shuttle service into a

viable and extremely well-loved operation.

31.     SCT's current owner, Donn Ricketts, a Vietnam veteran, began working at the shuttle

operations in 1986 alongside his father.

32.     Mr. Ricketts has devoted the past 31 years of his career to the shuttle operations.

### *SCT's operations*

33.    SCT's shuttle service takes visitors up and down the road in Sabino Canyon.  Among

other benefits, the shuttle allows handicapped and elderly people who cannot hike into Sabino

Canyon on their own to see the beauty of Sabino Canyon.  As the agency has noted, the shuttle

has expanded visitor access while also enhancing the visitor experience in Sabino Canyon.  In

fact, many visitors come to Sabino Canyon solely to ride the shuttle and view it as an attraction

itself.

34.    The Sabino Canyon area has a 5 star rating on TripAdvisor based on over 3,000

comments.  https://www.tripadvisor.com/Attraction_Review-g60950-d209268-Reviews-

Sabino_Canyon-Tucson_Arizona.html.

35.    The comments on this popular website include:

> *[Five stars]*
> *"Wonderful!"*
> This is so beautiful and the staff is very friendly and helpful. There's trails to walk
> on as well as a tram to take you to the canyon. I will be visiting again.
>
> *[Five stars]*
> *"Gorgeous, even in summer"*
> Too hot to hike at noon, so I took the tram. Beautiful creeks, pools and bridges.
> Recommend a return in early morning or end of day or fall.
>
> *[Four stars]*
> *"So much fun!"*
> Stop at Station 8 and play/swim in the stream! Sooo beautiful! Friendliest staff
> ever!!!! The tram ride is interesting and it's a place you can visit numerous times
> and never tire of it!
>
> *[Five stars]*
> *"Breathtaking"*
> Words cannot describe how gorgeous this place is. We took the tram up to the top
> and our driver/tour guide (Jason) was great. There were nine stops along the way
> if you wanted to exit the tram and explore. We stopped at the top and Jason let us
> get off the tram to get pictures and look around for a few minutes. We took bottles
> of water with us and I would suggest wearing tennis shoes and a hat. The views

were just spectacular. We did see a white tail deer but no mountain lion. Our tour guide Jason referred to a couple of areas as "the white sandy beaches of Arizona". LOL. We saw several people swimming at Crack Rock, which looked like a blast. The tour took about 45 minutes.

[Five stars]
*"Amazing Must See"*
This is a one of a kind experience. When arriving at the canyon be sure to take the tram. There are several stops along the way where you can get off and on at will. It is a great hiking, picnic, walking experience. Once at the top of the tram ride (motorized vehicle tram) many exit to take the trails to 7 Falls. It is just a beautiful, and you will learn all about the Saguaro cacti and animals of the Sonoran Desert.

https://www.tripadvisor.com/Attraction_Review-g60950-d209268-Reviews-Sabino_Canyon-

Tucson_Arizona.html.

36.     SCT owns many permanent improvements in the permit area within Sabino Canyon

Recreation Area, including many large concrete slabs, which are necessary to provide the shuttle

services.

37.     These improvements include:

-a 14' x 70' fixed trailer with affixed utilities used for the operations office;
-a 12' x 60' building for equipment storage;
-a 10' x 10' building for equipment storage;
-a mechanical shop/building for repairing operation vehicles;
-a fuel storage tank; and
-a septic tank.

Exh. A (at p. 1).

38.     SCT's original permit, which it took over from the prior operators two years after it was

initially issued, was for a ten-year period (1983-1993).  A second permit was then issued in 1991

to SCT for a 15 year period from 1991-2006.

39.     Because the operations involved privately owned improvements on the permit area, they had to be authorized under the Term Permit Act of 1915 pursuant to what the Forest Service has labeled a Term Permit.[1]

40.     SCT's current permit explicitly states that it is a "Term Special Use Permit" and was issued pursuant to the Term Permit Act of 1915 (16 U.S.C. § 497).  Exh. A (page 1).  Because SCT uses a ticket booth owned by the government, the permit also states that it is authorized under Section 7 of the Granger-Thye Act (16 U.S.C. § 580d), which is the statute that authorizes permit holders to use government improvements.  *Id.*

### *Delays in the Forest Service issuing a new long term permit to SCT*

41.     As of 2006, SCT began seeking another long term Term Permit.

42.     However, at the conclusion of SCT's 15 year permit term in 2006, the Forest Service issued short length permits for the period 2006-2009 because of the Forest Service's representations that it purportedly wanted to prepare a Sabino Canyon Recreation Area Concept Plan.

43.     The Forest stated that the purpose of the concept plan was "to provide the Forest with tools for improving and building an exceptional recreation experience for visitors, within a sustainable and environmentally sensitive framework."  Exh. B (Letter from Leslie Weldon to Marily Reese, Executive Director of the National Forest Recreation Association, dated Sept. 27, 2013); Exh. C (Letter from Jim Upchurch to Donn Ricketts dated November 12, 2013)).

44.     For the next two years, the Forest completed no work on the Sabino Canyon Recreation Area Concept Plan.

---

[1] For a brief two year period during SCT's 32 years of operations, the Forest issued SCT a short length temporary permit after a flood event that was not identified as a Term Permit.  However, the Forest subsequently corrected this error and resumed issuing SCT's Term Permits thereafter.

45.    In 2008, the Coronado National Forest contracted with the Volpe Center at the Department of Transportation (DOT) to conduct an inventory and analysis of the transportation system in Sabino Canyon as the beginning step in developing the Sabino Canyon Recreation Area Concept Plan.

46.     At this time in 2008, the Forest Service stated that it planned to amend and extend the existing permit until the concept planning and environmental analysis were completed.

47.    Because it had failed to complete the Sabino Canyon Recreation Area Concept Plan, at the conclusion of the first temporary term in 2009, the Forest Service issued another short-term permit extension for four (4) years for the period 2009-2013.

48.    In 2010, DOT completed the "2010 Transportation Analysis and Feasibility Study: Sabino Canyon Recreation Area" ("Volpe Study").  Exh. D.

49.    The Volpe Study surveyed visitors at the Sabino Canyon Recreation Area and, based on those surveys, DOT identified several goals, such as protecting historical and cultural sites and natural and ecological resources within Sabino Canyon, and then identified elements related to each goal.

50.    DOT then proposed five alternatives to "provide examples of how the elements can be combined to produce specific scenarios, none of which should be seen as binding."  Exh. D (at v).

51.    The Volpe Study went on to further state:

> Growing pressure on the Sabino Canyon transportation system, especially after a damaging flood in 2006, led the Coronado National Forest to apply to the federal Transit in the Parks (TRIP) program for funds to conduct a comprehensive study that would analyze existing conditions and formulate several alternatives that could be considered for the future. This report, produced by the U.S. Department of Transportation Volpe Center, is the final result of that study. However, this report is not considered a "decision document" and was not intended to fulfill the requirements of the National Environmental Policy Act or other U.S. Forest

<u>Service (USFS) compliance requirements; it is a feasibility study that does not recommend a "preferred alternative."</u>

Exh. D (at i)(emphasis added).

52.     The Volpe Study explicitly stated that the DOT had not completed any NEPA analyses regarding its various recommendations.  In the Volpe Study, DOT stated:

> The analysis was done to support the Sabino Canyon Recreation Concept Plan which is being done subsequent to this study; all NEPA compliance will be conducted as part of the Recreation Concept Plan.

Exh. D (at unnumbered page 3).

53.     The Coronado National Forest Forest Supervisor agreed that the Volpe Study "is not a decision document."  Exh. C (Letter from Jim Upchurch to Donn Ricketts dated November 12, 2013).

54.     Instead, the Forest Supervisor said the Volpe Study merely supports "important next steps" towards reaching a final decision, which included updating the Sabino Canyon Recreational Area Concept Plan.  Exh. D (Letter from Jim Upchurch to Donn Ricketts dated November 12, 2013).

55.     Because the Volpe Study was not a decision document, it did not make any findings as to which public demands the Forest or SCT should address.  Instead, as noted above, the DOT listed a wide range of possibilities ranging from taking no action, the Forest purchasing new vehicles and then providing a fare-free shuttle service and even the possibility of eliminating the shuttle service altogether.  Exh. D.

56.     The Forest never identified any specific or general proposals set out by DOT in the Volpe Study which it believed SCT should implement.

57.     After the Volpe Study was issued by DOT in 2010, SCT is not aware of the Forest completing any work on the Sabino Canyon Recreation Concept Plan in 2011.

58.     SCT is also unaware of the Forest completing any work on Sabino Canyon Recreation Area Concept Plan in 2012.

59.     In 2013, the Coronado Forest Supervisor stated that the Forest Service would be issuing a new Prospectus in the summer of 2013 for the transportation services with an award to be made in 2014.  Exh. E (Letter from J. Upchurch to Kevin R. Garden dated May 29, 2013).

60.     The Forest had never previously issued a Prospectus for SCT's operations, which was consistent with its longstanding policy in implementing the Term Permit Act of 1915.

61.     The Forest Service also had never issued a Prospectus asking interested entities to bid on a permit to continue existing recreational services being provided under a Term Permit when the permittee had been performing satisfactorily.

*62.*     SCT and its representatives then responded to the Forest Service by pointing out that the decision to issue a competitive Prospectus was completely contrary to how the Forest Service had carried out the terms and spirit of the Term Permit Act of 1915 for the past 100 years.

### *The Forest Service Deputy Chief's written assurance that*
### *SCT would have the opportunity for a new long term permit*

63.     As a result of those comments, the Deputy Chief of the Forest Service, Leslie Weldon, then clarified in a letter dated September 27, 2013 that she had spoken with Mr. Upchurch and the Forest Service was "committed to resolving the areas of concern" raised with regard to Mr. Upchurch's statement about issuing a competitive Prospectus.  Exh. B (Letter from Leslie Weldon to Marily Reese, Executive Director of the National Forest Recreation Association, dated Sept. 27, 2013).

64.     In her September 27, 2013 letter, Deputy Chief Weldon stated that the Forest Service "will continue to work with Sabino Canyon Tours, Inc. in soliciting ideas and comments as we

amend the elements of the concept plan, perform the environmental analysis, and develop terms

and conditions for a new shuttle service permit."  Exh. B.

65.     Deputy Chief Weldon then stated that the Forest Service wanted to implement changes to

the shuttle operations that might be called for as a result of the "environmental analysis and

decision."  Exh. B.

66.     Deputy Chief Weldon acknowledged that prior reports were not decision documents and

her reference to a decision was to a final decision to be made after the appropriate environmental

analyses was completed pursuant to NEPA.  Exh. B.

67.     Deputy Chief Weldon concluded by stating that, while the Forest Service would "solicit

for additional providers" if necessary, it would only do so if SCT was "unable to meet the

proposals set out in the _final plan_ to address changing public demands."  Exh. B (emphasis

added).

### _Further delays in issuing a new long term permit_

68.     After this letter, the Forest Service announced that it would be holding meetings during

the winter of 2013/2014 to gather public opinion for purposes of preparing a new Sabino Canyon

Recreation Area Concept Plan.

69.     No meetings were held.

70.     At the conclusion of SCT's second short-term extension period in 2013, the Forest

Service issued yet another short-term permit extension for 18 months to SCT's permit.

71.     The Forest Service stated to SCT that the concept planning process and environmental

analysis were taking "additional time."

72.     As of April 2015, the Sabino Canyon Recreation Area Concept Plan and environmental

analysis had not been completed.

### *SCT's efforts to purchase new and improved shuttle equipment*

73.    In a letter dated April 1, 2015 from SCT to the Forest Service, SCT explained that "given

the substantial costs associated with improving its services to the large numbers of visitors to

Sabino Canyon, [SCT] has been precluded during this period from improving its operations

because of its inability to recoup any investment over the course of a few years."  Exh. F (Letter

from Kevin Garden to Jim Upchurch dated April 1, 2015).

74.    SCT also stated that it "is prepared to make substantial investments in these operations"

under a long term permit.  Exh. F.

75.    On May 28, 2015, SCT's representatives sent the following request and offer to the

Forest on behalf of SCT:

> In response to questions previously asked of us by Mr. Flannigan, who apparently
> is no longer on the Forest, <u>SCT is very much interested in looking into purchasing
> new shuttles that address concerns raised by some members of the community.</u> As
> part of this effort, SCT has worked with the following people in its efforts to
> identify new shuttle equipment for Sabino Canyon, all of whom are very
> knowledgeable as to the issues of emissions and environmentally sensitive
> equipment that can function efficiently and effectively in mountainous areas:
>
> Colleen Crowninshield, Manager, Tucson's Clean Cities Program. Colleen has
> worked for Pima Association of Governments since 1994. In 2001, she assumed
> the Tucson Clean Cities responsibilities and became the full-time coordinator of
> the program. Colleen opened the first biodiesel retail station in Tucson. (In 2005,
> Colleen was named the U.S. Department of Energy Clean Cities Coordinator of
> the Year.)
>
> Ursula Kramer, Director, Pima County Department of Environmental Quality.
>
> Dr. Eric Betterton, Chairman, Pima County Environmental Quality Advisory
> Committee, Professor, University of Arizona, Head of the Department of
> Atmospheric Sciences, Director of the Institute of Atmospheric Physics.
>
> In meetings with these individuals, we have discussed equipment manufactured
> by different companies and SCT has looked into equipment produced by various
> US as well as international companies that could potentially be used in Sabino
> Canyon. These companies include Specialty Vehicles out of Nevada, Newport
> Coachworks out of California, Don Brown Bus Sales out of New York, and Smith

15

Electric out of Missouri. SCT has also looked into equipment sold by Liberty Electric Cars Ltd. in the United Kingdom.

Some of the issues that have come up with the various possible types of equipment include the ability of the engine to go up the winding Canyon road, the capacity of the seating, the availability of the fuel and the feasibility of the cost commensurate with the revenues of the operations. SCT is also looking into grants that may be available to support the use of certain types of shuttles for these types of operations.

SCT has been reaching out to other federal concessioners who operate shuttle services in the National Parks, such as Shark Valley Tram Tours in Everglades National Park, to discuss with them the various types of equipment which is available and the pros and cons of using it. Shark Valley purchased its trams from Trams International, California. A picture of them is set out below.



A critical element to identifying equipment that would be safe, reliable, capable and functional in mountainous terrain is the financial feasibility of the equipment. <u>In order to make this assessment and obtain the necessary financing from the bank, SCT needs to know the length of its permit</u>.

Exh. G (Email from Kevin Garden to Forest Service representatives dated May 28, 2015)

(emphasis added).

### *The Forest Service's admissions*
### *that it prevented SCT from purchasing new shuttle equipment*

76.     The Forest has acknowledged receiving this expression of interest from SCT, stating in a

subsequent Report that SCT "has expressed interest in electric-powered shuttles, but not without

a long-term permit, as the investment would be too risky otherwise." Exh. H (Report: Sabino

Canyon Shuttle Permit at 2).

77.     In its internal Communication Plan subsequently prepared in May 2017, the Forest again

reiterated that it was aware that SCT wanted to purchase new equipment but "has been hesitant

to invest in improvements to the shuttle operation without securing a long-term permit." Exh. I

(Forest Service Communication Plan May 2017 at 5).

78.     While the Forest Service had informed SCT that it could not issue a long term permit

until it completed its environmental analysis under NEPA, it was proceeding very slowly with

these analyses.

79.     On June 1, 2015, SCT had a meeting with the Coronado National Forest Acting Forest

Supervisor and staff.  SCT summarized that meeting in a follow-up letter, stating that:

> For the past nine years, there have been numerous short-term permits issued.
> These continuous short-term permits have impeded [SCT's] ability to make
> significant new investments in new trams, sound systems, and other
> improvements the Forest Service would like to see because financing such
> investments is dependent on the length of the permit.  Everyone at the meeting on
> June 1 recognized and agreed that a long-term permit is necessary to amortize
> such investments. Until a long-term permit is issued, the current situation will
> continue.  Donn [Ricketts] is doing the very best he can (and, based on the
> TripAdvisor comments, doing it very well), but he is looking forward to being
> able to upgrade his equipment and make other changes.

Exh. J (Letter from Kevin Garden to Andrew Johnson, Acting Deputy Supervisor, Coronado

National Forest dated June 10, 2015)(emphasis added).

80.     The Coronado National Forest then responded to this letter, stating that "[y]our letter provided an excellent summary of the meeting."  Exh. K (Letter from Jamie Kingsbury, Acting Forest Supervisor, Coronado National Forest, to Kevin Garden dated June 24, 2015).

81.     The Acting Forest Supervisor further stated that "we acknowledge that the past practice of short length extensions to Sabino Canyon Tours authorization has been problematic for Mr. Ricketts."  *Id.*

### *The agency's continued delays in issuing SCT a new long term permit*

82.     Because it had not completed the environmental analysis or made a final decision as to what, if any, changes it wanted made to the shuttle operations, in 2015 the Forest Service issued SCT a short length 2 year permit so that the agency could complete an EA.

83.     In September of 2015, the Forest released the Sabino Canyon Sustainable Recreation Concept Plan ("2015 Concept Plan"), nine years after first stating that it intended to do so.  Exh. L.

84.     The 2015 Concept Plan addressed the Forest's broad goals to provide "multiple-spectrum recreational experiences in Sabino Canyon" and applied to all the facilities in Sabino Canyon, including picnic tables, restrooms, grills and the roadway.  *Id.* at 3.

85.     The 2015 Concept Plan stated that it was only general "guidance to direct [the Forest's] management priorities" and set out the Forest's "vision" on how to enhance visitor enjoyment. *Id.*

86.     The 2015 Concept Plan made no decisions and therefore, because it was not a decision document, no NEPA or other environmental evaluation had been conducted as part of its development.

87.     The Forest Service never formally sought public comments on the 2015 Concept Plan. While SCT offered comments on the plan after it became aware of it, these comments were not incorporated into the document.

### *The NEPA process*

88.     In the following month, October of 2015, the Forest issued a scoping notice for a draft EA seeking public comment in regard to the agency's proposal to issue a 20-year term Special Use Authorization for the shuttle system.

89.     On November 12, 2015, SCT submitted comments to the scoping notice.  Exh. M.

90.     In those comments, SCT stated that the agency set out an improperly negative portrayal of the existing shuttle operations in the draft EA and had ignored the thousands of highly positive reviews related to SCT's shuttle operations on the TripAdvisor website.  *Id.*

91.     SCT alleged that the agency instead focused on a much smaller number of negative comments largely made by members of a local environmental group, the Friends of Sabino Canyon ("FOSC"), whose stated goal was to remove SCT.  *Id.*

92.     SCT's comments also objected to the agency's reference in the scoping notice to the 2015 Concept Plan because that document was never issued for public comment and thus the agency could not rely upon it as a decision document.  *Id.*

93.     In September of 2016, the Forest Service issued a draft EA. Exh. N.

94.     The draft EA found that "since inception the Sabino shuttle system has been a success." Exh. N at 6.

95.     The draft EA found that the current shuttle operations had no detrimental impact on the environment either through impacts on air quality or due to the noise from the shuttle units.  Exh. N at 45-46.[2]

96.     The draft EA stated that the Forest Service "proposes to issue a 20-year term Special Use Authorization (permit) for operation and maintenance of a shuttle system."  Exh. N at 8.

97.     One of the alternatives presented in the draft EA (Alternative 3) was to continue with the same shuttle operations under a new 20-year permit using the same equipment.  Exh. N at 14.

98.     The draft EA also stated that "the type of technology used to power shuttles is beyond the scope of this project" and "the purpose of this project is to permit a shuttle system in SCRA without dictating the specific technology that will be used."  Exh. N at 10.

99.     The draft EA further stated that any requirement for a specific method for payment of the shuttle ticket price was "administrative in nature" and not part of the NEPA process. Exh. N at 26.[3]

100.    The draft EA acknowledged that "[a]lmost all of the TripAdvisor comments are positive in regards to the [shuttle]- a few are negative."  Exh. N at 29.

---

[2] In 2002, SCT converted the engines in its shuttle vehicles so that they use biodiesel fuel.  By using biodiesel fuel, SCT's equipment results in far lower greenhouse gas emissions and is biodegradable.  As a result, SCT's vehicles are even more environmentally friendly than the Forest Service's vehicles and SCT received the 2002 Annual Transportation Award from The Metropolitan Energy Commission which was endorsed by both the City of Tucson and Pima County.

[3] The Forest Service had initially sought to have SCT accept credit cards, but SCT informed it that doing so would increase the fare price which would likely result in complaints to the agency from the public.  In light of this fact, the agency never required SCT to accept credit cards.  An ATM was subsequently installed at the Visitor Center which accommodated those without cash and allowed for the ticket prices to remain the same.

101.    The draft EA also stated that "positive comments" from the public about the shuttle experience "are not discussed" in the EA because the agency was focused solely on "user conflict."  Exh. N at 28.

102.    Nothing in the draft EA contradicted Deputy Chief Weldon's assurance that SCT would be given the opportunity to address the changing public demands, as determined by the Forest at the conclusion of the NEPA process, in a long term permit.

103.    On October 12, 2016, SCT submitted comments on the draft EA.  Exh. O.

104.    In its comments, SCT noted that the Draft EA improperly skewed its review of relevant comments from the public to ignore the vast numbers of positive comments and portray the current shuttle operations in a negative light.  *Id.*

### *The local special interest group's campaign against SCT*

105.    In March of 2017, FOSC, a local special interest group, began an aggressive campaign to pressure the Forest Service to remove SCT.

106.    FOSC has openly admitted that its goal was to drive out Mr. Ricketts and SCT.   As reported in a local newspaper article, "Paul Marques, president of Friends of Sabino Canyon [FOSC], which has been lobbying for shuttle changes and was founded by Click and Zuckerman in 1993, said he hopes to see someone other than Ricketts take over").  *See http://tucson.com/news/local/permit-to-operate-sabino-shuttle-to-be-opened-for-competitive/article_cd15ccf0-40ec-565e-9cbc-2f012f4130e5.html.*

107.    A local newspaper article reported that the founders of FOSC include "a couple of Tucson's biggest big shots," and referred to them as "the big guns [] firing in the battle of Sabino Canyon."  *http://tucson.com/news/local/columnists/steller/steller-pressure-increases-to-get-new-sabino-tram-operator/article_b3421c37-1dab-58cc-8c10-121429adb55a.html.*

108.   In March of 2017, FOSC posted a notice on its website stating "Your Urgent Help Is Needed!"  Exh. P.

109.   In that notice, FOSC claimed that SCT's shuttles have "noisy engines, choking fumes and intrusive narration over loudspeakers" which it asserted detracts from the public's experience in Sabino Canyon.  *Id.*

110.   These assertions were contradicted by the 5 star rating on TripAdvisor which was the result of thousands of non-biased reviews by the public at large, but FOSC, which was a small but powerful local interest group, never mentioned that fact in its notice.  In addition, the draft EA found the shuttle engines and noise level had no detrimental impact on the natural environment and any impact was solely a matter of "human perceived aesthetics."  Exh. N at 45-46.

111.   Upon information and belief, FOSC made these negative assertions about aesthetics without being aware SCT had been trying to purchase new shuttle equipment but was precluded by the Forest Service's inability to issue a long term permit.

112.   The FOSC notice also stated that:

> In the next month or so the Forest Service (USFS) is likely to award SCT, which has been providing this shuttle service for over 30 years, the right of first refusal to bind on a new 20-year operating permit.  Absent significant political pressure, we have come to understand that this will be difficult to derail.

Exh. P.

113.   The FOSC notice then provided a form letter for its members to use and urged them to send the letters to Congresswoman Martha McSally in an effort to put political pressure on the agency to reverse its decision.  Exh. P.

114.   In addition, after being informed by the Forest Service that it was not permitted to do so, FOSC nonetheless set up a table at the Forest Service Visitors Center in the Sabino Canyon

Recreation Area which it staffed with its members who were asking people to sign a petition urging the Forest Service not to issue a permit to SCT.

115.    The Forest's District Recreation Staff Officer and the Permit Administrator for SCT, Rudy Bowen, then joined the FOSC members at their table while they were seeking these signatures from the public.  Mr. Bowen was in his official Forest Service uniform at the time.

116.    Only after SCT protested that this effort was improper and illegal did the Forest have the table removed.

117.    No action was taken by the Forest against FOSC or Mr. Bowen.

118.    To correct the false and disparaging statements being made by FOSC, on March 31, 2017, SCT issued a press release.  In that press release, SCT stated:

> Sabino Canyon Tours' owner, Donn Ricketts is actively researching new shuttle equipment, including both low-emission and no-emission technology, in order to upgrade its current fleet of vehicles which operate in Sabino Canyon within the Coronado National Forest.  Sabino Canyon Tours' prior long-term contract ended in 2006, and it has been operating for the past 11 years under a series of short-term contract extensions – for 18 months and 2 years each.  Because of the very limited duration and tenuous nature of these extensions, Sabino Canyon Tours has been unable to amortize the significant investment that will be necessary to purchase new and improved equipment.  Financing new equipment over a period of years is very similar to taking out a loan for a new house, which typically allows for 15 or 30 years.  If the long-awaited contract is issued by the Forest Service, Mr. Ricketts will finally be able to move forward and make the financial commitment needed for these improvements.

> In preparation of the new contract, Mr. Ricketts has been working closely with Pima County's Clean Cities Program for the past two years to identify low impact shuttle vehicles which can safely meet the needs of visitors, as well as to navigate safely the mountainous geography of Sabino Canyon.  He has been in close contact with several equipment providers as part of his effort to take advantage of the most advanced and feasible technology.  He has also been in contact with other shuttle service operators throughout the country to stay up to date with the current technology.  Mr. Ricketts commented that "Sabino Canyon Tours is focused on implementing new equipment which takes advantage of the newest and latest in technology for the transportation industry in carrying multiple passengers."

Exh. Q.

### *The agency's reversal of position*

119.   Several months later in a letter dated May 31, 2017 sent to SCT, the Regional Forester for the Southwestern Region of the USDA Forest Service reversed the agency's prior decision to give SCT an opportunity to meet the public demands as determined by the agency after the EA was completed under a new long term permit.  Exh. R (Letter from Calvin Joyner to Donn Ricketts dated May 31, 2017).

120.   In his letter dated May 31, 2017, the Regional Forester stated to SCT that the Forest was "nearly completed" with the final EA.  Exh. R.

121.   In that letter, the Regional Forester also stated that the Forest Service would not make a final decision as to which alternative it would select under the final EA before June 30, 2017. Exh. R.

122.   Even though the draft EA had found the shuttle operations had no detrimental environmental impact on the Sabino Canyon Recreation Area, the Regional Forester's May 31, 2017 letter stated that, in the past four months, the agency had "received telephone calls, emails, and copies of letters to Congresswoman McSally's office expressing environmental concerns regarding the current shuttle operations in the Sabino Canyon Recreation Area."  Exh. R.

123.   The Regional Forester's May 31, 2017 letter also stated, with no specifics, that "the District Ranger for the Santa Catalina Ranger District has had discussions with you [SCT] regarding the increasing and changing public demands for the transportation system and recreational experience in Sabino Canyon."  Exh. R.

124.   SCT is unaware, however, of any such discussions with the District Ranger where the District Ranger identified any particular changes he or the Forest required SCT to make to the permit.  Instead, the Forest consistently referred to the fact that it would be making a decision as

to what potential changes it wanted made in the Final Decision based on the final EA, which had not yet been issued.

125.     In that May 31, 2017 letter, the Regional Forester also stated that the Forest "became aware" of several parties who were "interested" in providing the shuttle services.  Exh. R.

126.     In a sudden reversal of its past position and consistent with FOSC's demands, the Regional Forester then asserted that the Forest intended to issue a competitive Prospectus to issue a permit which would continue the shuttle services which had been provided by SCT since 1985.  Exh. R.

127.     The Regional Forester further asserted in his May 31, 2017 letter that the Forest had now become aware of others who were interested in taking over the longstanding shuttle operations and the Forest was therefore required under the law to issue a Prospectus for any permit pursuant to 36 C.F.R. § 251.58(c)(3)(ii) because of this competitive interest.  Exh. R.

128.     Contrary to the Regional Forester's assertion, 36 C.F.R. § 251.58(c)(3)(ii) only applies to new concession services or a substantially amended concession authority, neither of which applies to the shuttle services which have been provided by SCT for the past 30+ years.

129.     The Forest Service has never previously interpreted 36 C.F.R. § 251.58(c)(3)(ii) to require it to issue a Prospectus soliciting bids for existing concession services under a Term Permit, such as that held by SCT, when those services have not been terminated due to the conduct of the permit holder.

130.     The Regional Forester further stated in his May 31, 2017 letter that Forest Service Manual 2343.03(¶2) requires the Forest Service to issue a Prospectus "when competition exists." Exh. R.

131. Forest Service Manual 2343.03(¶2), however, also applies to "new" concession sites. SCT's operations, which have been in existence for over 30 years, are not a new concession site.

132. The Forest Service has never previously interpreted Forest Service Manual 2343.03(¶2) to require it to issue a Prospectus soliciting bids for existing concession services under a Term Permit, such as that held by SCT, when those services have not terminated due to the permit holder's violation of the permit terms.

133. The Regional Forester also asserted in that letter that the Forest Service had to issue a Prospectus pursuant to Forest Service Manual section 2712.1 "[w]hen careful multiple use or functional planning [] indicate[d] that a concession special use opportunity is available." Exh. R.

134. In the instant case, the concession operation had been in existence for over 30 years and was not the result of any new determination through "careful multiple use or functional planning" that a concession opportunity was now available.

135. In a draft letter to SCT, which was never sent, the Forest Service revealed that its decision to reverse its position was due solely to a desire to appease local interests, as opposed to a change in facts or determination that its prior position was invalid, stating:

> This letter is to provide you with an update on how the US Forest Service Southwestern Region and Coronado National Forest intend to move forward in the months ahead in terms of issuing a new authorization for the operation and maintenance of a shuttle system at Sabino Canyon Recreation Area. As you are aware, our recent position of allowing Sabino Canyon Tours, Inc. (SCT) the first right of refusal on a new authorization- under the condition that SCT can demonstrate that the terms, conditions, and permit holder responsibilities outlined in a Prospectus can be met as part of a bid package special use permit application- has generated much concern and debate from the public that we represent. Over 175 letters have been sent to the Arizona Congressional District 2 office on this topic in recent weeks, the majority of which call for open competition ahead of issuing a new authorization.
>
> With any decision we make relative to concession opportunities on National Forest System land, we need to balance our desire for equal opportunity, enhancement of customer services, and fair market value return to the government with our respect

for the expertise and investments delivered by concession operators who currently provide recreation opportunities under special use permit. [] <u>At this time, it is our position that the best way to strike a balance between all these interests is to solicit competitive interest through the advertisement of a Prospectus, and for SCT to compete alongside other capable operators</u> with the same rights and conditions as other entities also seeking to operate and maintain the shuttle system.

Exh. S (Draft Letter from Cal Joyner to Mr. Ricketts (undated))(emphasis added).

136.    In an additional admission that it changed its position solely due to pressure by the local special interest group and negative media coverage as opposed to a change in the facts supporting its prior decision or determination that its prior decision was in error, the Forest Service stated in its internal Communication Plan specifically prepared to address this situation and dated May 2017 that:

> Once the NEPA process is completed, the forest intends to advertise a Prospectus, and SCT will compete on equal footing alongside other capable operators for a new authorization. <u>This represents a change in the position the forest had taken from August 2016 through April 2017.</u> During that time, the local unit had been communicating to external audiences the forest's intent to advertise a Prospectus, and provide SCT the option to secure a long-term permit if they could demonstrate that special use permit requirements defined in the Prospectus could be met, before the forest considered other parties. This positon was based, in part, on a September 27, 2013 letter to Marily Reese, Executive Director with the National Forest Recreation Association from Leslie Weldon, Deputy Chief, which stated in part: "We will continue to engage with Sabino Canyon Tours to examine opportunities to expand their operations to meet increasing and changing public demands. If Sabino Canyon Tours is unable to meet those demands, we plan to solicit for additional providers."

> This position generated much concern and debate from the public, and has been the subject of multiple new[s] stories and editorials in local media outlets. Over 175 letters were sent to the Arizona Congressional District 2 office on the topic, the majority of which called for open competition ahead of issuing a new authorization.

Exh. I at 4 (emphasis added).

137.    Because the Forest had not stated to SCT that it would renege on Deputy Chief Weldon's assurance and violate longstanding agency policy by issuing a competitive Prospectus in this

situation before the Regional Forester's surprising reversal of position in his May 31, 2017 letter,

SCT had not commented on the need for the EA to address the ground disturbing activities that

could result due to this decision.

138.    By letter dated June 19, 2017, SCT responded to the Regional Forester's letter, objected

to the Regional Forester's conclusions, explained the bases for its objections and asked the

Regional Forester to reconsider his decision to issue a competitive Prospectus.

### *The Final EA*

139.    On June 27, 2017, the Forest issued the final EA.  Exh. T.

140.    The final EA found that the current shuttle operations had no detrimental impact on the

environment either through impacts on air quality or due to the noise from the shuttle units.  Exh.

T at 45-46.

141.    The final EA also found that "[m]any visitors come to the SCRA solely to ride the shuttle

and view it as an attraction itself."  Exh. T at iv.  The final EA also concluded that "[t]he shuttle

has expanded visitor access and enhanced visitor experiences."  Exh. T at vi.

142.    The final EA, as had the draft EA, still contained an alternative (Alternative 3) which was

to continue with the current shuttle operations as is.  Exh. T at 15.

143.    The Forest also issued a draft Decision Notice and Finding of No Significant Impact with

regard to its final decision as to which alternative in the final EA it had selected.  Exh. U.

144.    In the draft Decision Notice, the Forest stated that it was intending to select Alternative 2,

which imposed certain requirements under the new permit to address public demands, and not

select Alternative 3 which would have been to continue with the existing shuttle services.  Exh.

U.

145.    However, the Forest still had not made its final decision as to which of the alternatives set out in EA it had selected.

146.    On August 3, 2015, SCT submitted its objections to the final EA.  Exh. V.

147.    In that submission and in addition to the items it had previously identified in its October 12, 2016 comments to the draft EA, SCT objected to the Forest's failure to address likely ground disturbing activities which were sufficiently likely to result from the Regional Forester's recent May 31, 2017 decision to issue a competitive Prospectus for the shuttle operations.  SCT specifically informed the agency that this omission was a violation of NEPA.  Exh. V.

### *The agency's new assertion that*
### *SCT has shown it is unable to meet changing public needs*

148.    On August 15, 2017, the Regional Forester responded to SCT's June 19, 2017 letter. Exh. W.

149.    In his August 15, 2017 letter, the Regional Forester stated, for the very first time, that the agency's May 31, 2017 decision to issue a competitive Prospectus was made because "the Forest has determined that SCT has not demonstrated its ability to meet" and "was unable to meet [the] increasing and changing public demands." Exh. W.

150.    This was the first time SCT had ever heard this allegation from the Forest Service.

151.    The Regional Forester claimed that this alleged failure by SCT as of May 31, 2017 justified the agency's decision not to give SCT a right of first refusal to continue the shuttle operations notwithstanding Deputy Chief Weldon's prior assurance that SCT would be given this opportunity, but to instead issue a competitive Prospectus.  Exh. W.

152.    The Regional Forester incorrectly asserted that Deputy Chief Weldon's assurance was based on SCT meeting public demands (1) under its short length permits and (2) before any final decision by the agency as to what those public demands were.  Exh. W.

153.    However, this assertion by the Regional Forester is contradicted by the plain words in Deputy Chief Weldon's letter and the Forest's own assertions.

154.    Deputy Chief Weldon's letter made it clear that SCT would be required to agree to future identified changes in shuttle operations (1) under a long term permit and (2) only after the agency had decided what those changes should be.   Exh. B.

155.    The Forest had previously agreed SCT could not purchase new equipment to address the public demands under its short length permits.  Exhs. J, K.

156.    The Deputy Chief also acknowledged in her letter that the prior documents related to the shuttle operations did not constitute any final decision on what changes were to be made.  Exh. B.

157.    In addition, the Regional Forester's assertions in his August 15, 2017 letter were also directly contradicted by prior statements by the Forest.

158.    The statements were contained in a draft of a document provided to SCT under the Freedom of Information Act, which stated:

> The Weldon letter has been interpreted by the Forest and Southwest Regional Office as a need to provide first refusal to the current holder [Weldon, September 2013].

Exh. X.

159.    That document then went on to identify one option, which was:

> Prepare a Prospectus for the purpose of defining the required desired conditions and services to be provided by the permit holder.  Offer the current permit holder the opportunity to meet requirements prior to solicitation by others.  If issued a new authorization, the permit holder would agree to meet specific and tangible goals with the first 2 years, including replacement of the existing shuttle fleet.

> If the current permit holder does not accept the offer or fails to meet the specific goals within the first 2 years, the Forest would solicit competitive bids to provide the required desired conditions and services outlined in the same Prospectus.

Exh. X.

160.   While the Regional Forester did not specify the precise public demands which SCT had allegedly failed to meet in his August 15, 2017 letter, he asserted that his determination was based on the general contents of the Volpe Study, the 2015 Concept Plan and the final EA, none of which were decision documents.  Exh. W.

161.   At the time of the Regional Forester's letters dated May 31, 2017 and August 15, 2017, the Forest Service had not yet made any decision as to what changes were necessary to the shuttle operations.

162.   The Regional Forester also stated that "the Forest Service disagrees that SCT's failure to demonstrate its ability to meet increasing and changing public demands for the shuttle system in the Sabino Canyon Recreation Area is due to a lack of a long term permit, and contrary to page 2 of [your] June 19 letter has never agreed with that assertion."  Exh. W (emphasis added.)

163.   This statement by the Regional Forester was erroneous and is directly contradicted by the record.

164.   In fact, the Acting Deputy Supervisor of the Coronado National Forest had agreed that the Forest's continuous short-term permits impeded SCT's ability to make the significant investments needed to purchase new shuttle equipment and any other improvements because of the inability to amortize the investment.  Exh. K (Letter from Jamie Kingsbury, Acting Forest Supervisor, Coronado National Forest to Kevin Garden dated June 24, 2015)(confirming the statements set out in the letter to Andrew Johnson, Acting Deputy Supervisor, Coronado National Forest, from Kevin Garden dated June 10, 2015) at Exh. J).

165.   It was not until the Forest Service sent a letter dated August 15, 2017 that the Forest Service, for the very first time, provided a list which contained some of the alleged "public

demands" for changes in shuttle operations which it believed SCT should have addressed prior to May 31, 2017. Exh. W.

166. The May 31, 2017 decision that SCT had failed to meet public demands for changes to the shuttle operations, however, was made five months <u>before</u> the agency had made a decision as to which of the public demands it had decided should be addressed in future shuttle operations.

167. In addition, the Regional Forester's August 15, 2017 letter also explicitly noted that not all of the public demands set out in his letter were confirmed in the upcoming final EA and thus would not be confirmed as necessary by the agency's final decision. Exh. W.

168. Furthermore, the Regional Forester's August 15, 2017 letter also stated the list in his letter was not comprehensive and did not contain all of the public demands which should have been addressed, but he did not identify any other public demands. Exh. W.

169. The list set out in the Regional Forester's August 15, 2017 letter consisted of the following items:

-employ alternative motor vehicle technology, including motor vehicles that run on alternative fuels or electricity;[4]

-address engine noise and noise from narration emanating from shuttle cars;

-address air quality concerns related to shuttle exhaust;

-revise the number and timing of shuttle trips and shuttle stops;

-provide for electronic payment of fares, boarding in the canyon, and interpretation via handheld devices, headphones, or other minimally intrusive equipment; and

-provide accessibility for the disabled and elderly.

---

[4] This assertion contradicted the agency's statements in the draft EA where it stated that the agency could not dictate "the type of technology used to power shuttles" and "the purpose of this project is to permit a shuttle system in SCRA without dictating the specific technology that will be used." Exh. N at 10. Notably, even in the subsequently issued Prospectus, the Forest Service never demanded this type of equipment. *See* Exh. EE.

Exh. W.

170.    In addition to the fact that the agency had never before provided a list of any public demands which it believed should be addressed by SCT, the list in this letter was not complete and the agency noted that the list also possibly contained items the agency did not require to be addressed.  *Id.*

171.    In addition, all of the items on the partial list provided in the August 15, 2017 letter require substantial investments which can only be recovered under a long term permit as opposed to a short length permit.

172.    In his August 15, 2017 letter, the Regional Forest also stated that he believed the 5 star rating on TripAdvisor regarding Sabino Canyon was irrelevant to the issue of whether SCT was meeting the public's demand.  Exh. W.

173.    The Regional Forester's basis for this incredulous assertion was that the reviews were "for the Sabino Canyon Recreation Area as a whole" and "not limited to, or focused on, SCT's operation of the shuttle system in the Sabino Canyon Recreation Area."  *Id.*

174.    Contrary to the Regional Forester's assertion, the reviews on TripAdvisor, as noted above, focus extensively on the shuttle operations.

175.    In addition, the Forest has admitted that the shuttle has an impact on the experience of all visitors to Sabino Canyon, regardless of whether they ride the shuttle or not.  Exh Y ("The shuttle service has an impact on visitor experience regardless of mode of travel within the canyon").

176.    Therefore, the Regional Forester's explanation for why he felt this highly relevant data was irrelevant was contradicted by the TripAdvisor reviews as well as the agency's own statements.

177.    SCT's counsel responded to the Regional Forester's August 15, 2017 letter in a letter dated August 30, 2017.  Exh. Z.

178.    In SCT's August 30, 2017 letter, SCT explained the illogic of the Regional Forester's decision and the basis for SCT's continuing objection to the Regional Forester's decision that SCT was unable to meet the changing public demands for shuttle services in the Sabino Canyon Recreation Area.  *Id.*

179.    In response, the Regional Forester then sent a letter to SCT dated October 4, 2017 in an effort to further justify his decision to issue a competitive Prospectus based on his determination that SCT was unable to meet changing public demands.  Exh. AA.

180.    In that October 4, 2017 letter, the Regional Forester attempted to support his decision by raising a new claim that SCT had never sent the Forest "a plan for addressing the increasing and changing public demands detailed in" the Volpe Study, the 2015 Concept Plan or the draft or final EA.  *Id.*

181.    However, as discussed above, the Forest had never made a decision as to which specific public demands the agency had determined should be addressed by SCT through changes to its shuttle operations, therefore it was not possible for SCT to send the type of plan the Regional Forester was now claiming should have been sent.  In addition, the Forest had never requested any such plan.  Furthermore, as the agency had agreed, SCT could not have invested in new shuttle equipment even if the Forest had determined and informed SCT that it was necessary because it was operating under short length permits.

182.    Notably, the Volpe Study and 2015 Concept Plan cited by the Regional Forester as clearly showing these public demands contained literally hundreds of such demands by various

members of the public, many of which were contradictory and many of which were ultimately rejected by the Forest Service.

183.     In addition, the draft and final EAs had actually included as a possible alternative the continuation of the very same shuttle services SCT was providing with the same equipment SCT was using (Alternative 3).  Exhs. N, T.

184.     The inclusion of Alternative 3 as a potential alternative for the agency to select after the NEPA process was complete made it clear that the Forest had not made a decision that SCT was required to make any changes to its operations until the Forest rejected Alternative 3.

185.     Therefore, it was simply not possible for SCT to do what the Regional Forester insisted that it was supposed to have done (*i.e.*, guess which public demands the agency would want it to address and then make changes to its operations and purchase expensive equipment under a short length permit) in order to receive its right of first refusal for a new, long term permit.

186.     On November 1, 2017, SCT's counsel sent a letter to the Regional Forester objecting to the statements made in his October 4, 2017 letter and again pointing out the impossible task which he claimed SCT should have accomplished.  Exh. BB.

187.     The Regional Forester then responded by stating that the Washington Office of the Forest Service would respond to SCT's November 1, 2017 letter.

188.     Based on objections it had received, the Forest Service then amended the final EA to make certain changes.

189.     On November 3, 2107, and after making these changes to the final EA, the Forest Service issued its Final Decision.  Exh. CC.

190.     In that Final Decision, the agency selected Alternative 2 from the Final EA, and not Alternative 3.  *Id.*

191.     Alternative 2 was selected because it "strikes an appropriate balance among opportunities to improve on the existing transportation services provided in the Sabino Canyon Recreation Area." *Id.*

192.     Deputy Chief Weldon then sent a letter to SCT's counsel dated November 27, 2017.  In that letter, Deputy Chief Weldon stated that "[w]e fully support the position taken by the Southwestern Region, the Coronado National Forest and the Santa Catalina Ranger District as presented in Mr. Joyner's letters of May 31, August 15, and October 4, 2017, regarding the Forest's decision to issue a Prospectus for the SCRA shuttle system."  Exh. DD (Letter from Leslie Weldon to Kevin Garden dated November 27, 2017).

193.     In that letter, Deputy Chief Weldon incorrectly asserted that "Mr. Joyner's August 15 letter on the Forest's decision to issue a Prospectus is consistent with my September 27, 2013 letter" regarding the conditions where the Forest would issue a Prospectus for the shuttle services at issue.  *Id.*

194.     Deputy Chief Weldon based her confirmation on her erroneous determination that the Forest had properly "determined the SCT has not demonstrated its ability to meet increasing and changing public demands based on the [Volpe Study] and the [2015 Concept Plan] for the SCRA shuttle system and as reflected in the environmental analysis and decision for the shuttle system and Mr. Joyner's three letters."  *Id.*

195.     As demonstrated above, the determination by the Regional Forester, as confirmed by Deputy Chief Weldon, that SCT had been required to meet these "increasing and changing public demands" under its short length permits and had shown that it was unable to meet these public demands was not supported by and actually contradicted by the record.

### *The Prospectus*

196.    On November 28, 2017, the Forest Service issued a Prospectus and Request for Application for a Shuttle System for the Sabino Canyon Recreation Area.  Exh. EE.

197.    In that Prospectus, the Forest Service admitted that it "recognized the need to consider how to meet current and future public needs and how to provide a shuttle system that contributes to the vision for the Sabino Canyon Recreation Area [t]hrough the environmental analysis and subsequent public scooping and comments." Exh. EE at 4.  This statement further demonstrates that the Forest had not made any determination as to how to meet public needs prior to the EA being completed.

198.    The Prospectus stated that the "Forest Service had recognized the need to consider how to meet current and future public needs" with the shuttle system and the Prospectus "offers the opportunity to [] respond to increasing and changing public demands for a shuttle system. . . ." Exh. EE at 4.

199.    Without providing any reasoning for its change in position, the Prospectus also stated that, while the EA addressed a 20 year permit, the Forest had decided that the permit to be issued for shuttle operations would be for a period of five years.  *Id*. at 29.  The Prospectus further stated that, at the sole discretion of the Forest Service, the agency may issue an extension of the permit for an additional 5 years.  *Id*.

200.    SCT is interested in continuing to provide the shuttle services in Sabino Canyon Recreation Area.  While SCT believes it should be given the right of first refusal to provide these services and without waiving that position, if that right is not provided by the Forest, SCT intends to submit a proposal for the permit provided that the term of the permit is adequate to recoup the investment required.

201.    The Prospectus stated that, if the agency's decision to select a permit holder is appealed, a permit will not be issued until the appeal is resolved.  Exh. EE at 29.

202.    By letter dated December 20, 2017, SCT's counsel responded to Deputy Chief Weldon's November 27, 2017 letter and once again referred to the illogical and contradicted claim that SCT had to make unidentified changes to the shuttle operations under its short length permits before the Forest Service decided what those changes should be.  Exh. FF.

203.    Recently produced internal Forest Service documents which were provided pursuant to a request under the Freedom of Information Act contradict many of the agency's prior assertions regarding SCT.

204.    The recently obtained documents reveal that a team of Forest Service employees from outside the Coronado National Forest was sent to the Forest to investigate the situation involving SCT and the Forest staff.  Exh. H.

205.    The Forest Service team analysis was based on an investigation it conducted in or around 2016-2017.

206.    The Forest Service team concluded that, since 2006, the local Forest staff had deliberately not issued SCT a new, long term Term Permit because the local Forest wanted to terminate SCT's permit based on the contrived claim that SCT had not properly performed under the existing permit.  Exh. H at 2.

207.    The Forest Service team also found that SCT had never had any negative evaluations that would justify the Forest terminating SCT's permit.  *Id.*

208.    This finding by the Forest Service investigating team contradicts the Forest's prior claim to SCT back in 2006 that it had not issued a long term permit because it purportedly wanted to prepare a Sabino Canyon Recreation Area Concept Plan.

209.     The Forest Service team further concluded that, when the Forest was not able to terminate SCT's permit, it deliberately issued SCT short length permits "to provide a sense of control" by the Forest.  *Id.*  The Forest Service team further concluded that these short term permits left Mr. Ricketts and SCT "struggling to do long-term planning and/or make long term investments for his business."  *Id.*

210.     After conducting its thorough analysis of the situation at Sabino Canyon, the Forest Service team concluded that, notwithstanding the hindrances imposed by the Forest, "[i]t is clear the Sabino Canyon Shuttle is a locally loved and successful service," "[SCT] has continued to run [its] business successfully, and uninterrupted, and it is a hugely popular attraction in Tucson."  Exh. H at 6, 7.

## CAUSES OF ACTION

### Count I

### *Violation of the Term Permit Act of 1915*

211.     SCT repeats and re-alleges the allegations in paragraphs 1-210 as if set forth fully herein.

212.     The Forest Service's Organic Act, 16 U.S.C. § 551, states that the Secretary of Agriculture "may make such rules and regulations [regarding our National Forests] to regulate their occupancy and use. . . ."

213.     The Term Permit Act of 1915 explicitly authorizes the Secretary of Agriculture to issue permits "for periods not exceeding thirty years, for the purpose of constructing or maintaining hotels, resorts, and any other structures or facilities necessary or desirable for recreation, public convenience or safety."  16 U.S.C. § 497(a).

214.     The Term Permit Act of 1915 was enacted in order to induce private entities to invest substantial funds in building and operating facilities within the National Forest System that would meet the public demand for high quality recreational services.

215.     Section 251.53(d) of Title 36 of the C.F.R. states, in relevant part, that "the Chief of the Forest Service, or other Agency official to whom such authority is delegated, may issue special use authorizations for National Forest System land under the authorities cited and for the types of use specified in this section as follows: (d) Term permits under the Act of March 4, 2015, 38 Stat. 1101, as amended, 70 Stat. 708 (16 U.S.C. 497) for periods not over 30 years and (1) for not over 80 acres for (i) hotels, resorts, and other structures and facilities for recreation, public convenience, or safety . . . ."

216.     Forest Service Manual 2343.03(Policy) provides direction to the agency on how and when to issue Prospectuses, stating:

> Manage concession sites, activities, and programs according to the policies in section 2340.3, the following policies, and the specific direction for each category of use.
>
> Authorize concession developments only where there is a demonstrated public need. Do not permit concession development either solely for the purpose of establishing a profit-making commercial enterprise or where satisfactory public service is or could be provided on nearby private or other public lands.
>
> Issue Prospectuses to solicit proposals for development of <u>new</u> concession sites when it is in the public interest or when competition exists or may be created. <u>Give existing concessioners an opportunity to expand their operation to meet increasing public needs before offering new sites for development</u>.

(Emphasis added.)

217.     SCT has been providing the shuttle services at issue in the Sabino Canyon Recreation Area since 1985.  For all but two years of its operations, SCT's operations have been authorized pursuant to a Term Permit.  SCT's current Term Permit explicitly states that it was authorized pursuant to the Term Permit Act of 1915.

218.    In reliance on the agency's longstanding policy to reissue Term Permits to permit holders

who did not violate the terms of their permit and its confirmation of this policy in its letter dated

September 27, 2013, SCT had continued to invest in and maintain substantial privately owned

improvements needed to provide the shuttle services in the Sabino Canyon Recreation Area.

219.    The Forest Service follows the above-referenced policy with regard to all of the Term

Permits it issues, which include permits issued to such noted recreational operations as Vail

Resorts and Aspen Skiing as well as permits issued to many small recreational providers as well.

220.    SCT's Gross Fixed Assets which consist of its privately owned improvements and

equipment required to provide the shuttle services have recently been valued by the Forest

Service as of 2015 at $759,993.

221.    The Forest Service provided written assurance to SCT that, consistent with the agency's

longstanding policy in implementing that Term Permit Act of 1915, SCT would be given the

opportunity to continue its operations under a successive Term Permit, and subsequently violated

both the spirit and terms of the Term Permit Act of 1915 by reneging on that assurance.

222.    The Forest Service erred as a matter of law in determining that regulations and its policy

required it to renege on its assurances and instead issue a Prospectus for a permit for the shuttle

services which had been in existence for over 30 years when SCT had not violated the terms of

its permit.

223.    The Forest Service cited to the following authorities as legally mandating that it issue a

competitive Prospectus seeking offerors to take over the shuttle operations: 36 C.F.R. §

251.58(c)(3)(ii); Forest Service Manual 2343.02(¶2); and Forest Service Manual 2712.1.

224.    None of these authorities apply to the instant situation because it does not involve a new

concession opportunity, significant changes to the existing concession operations or an

application that has been filed with the agency by new applicant seeking to take over SCT's existing operations and purchase its facilities.

225.    Nor, upon information and belief, have defendants ever invoked these authorities in the past to support issuance of a competitive Prospectus for an ongoing concession operation authorized under a Term Permit where the permittee has not violated the permit or agreed to voluntarily sell its operating assets.

226.    SCT will be harmed by the defendants' decision because SCT's permit states that, if its authorization terminates, it will have to sell or remove its structures and improvements and restore the site to the satisfaction of the Forest Service.

227.    By issuing a competitive Prospectus, the Forest Service created the risk that SCT will have to sell, at greatly reduced prices, or remove its substantial privately owned improvements even though SCT has not violated the terms of its permit.

228.    This result will cause significant financial harm to SCT.

229.    The agency's determination not to honor its written commitment to follow its longstanding policy and the Term Permit Act of 1915 based on the erroneous determination that SCT has shown that it is incapable of meeting the public demands was contrary to law, arbitrary, capricious and an abuse of any discretion the agency may have had.

230.    The agency's determination is arbitrary and capricious and should be vacated and set aside under the APA.  5 U.S.C. § 706(2)(C).

## Count II

### *Violation of the Forest Service's Organic Act, Term Permit Act of 1915 and the Federal Lands and Recreation Enhancement Act*

231.    SCT repeats and re-alleges the allegations in paragraphs 1-230 as if set forth fully herein.

232.    The Prospectus which the Forest Service issued violates the Term Permit Act because it

fails to provide a sufficiently lengthy term to allow businesses to recoup the financial investment

required to meet its terms.

233.    The Prospectus stated that it is seeking proposals which respond to increasing and

changing public demands for a shuttle system.  Exh. EE at 4.

234.    The Prospectus also stated that the shuttle system will be authorized by a special use

permit issued under the Federal Lands Recreation Enhancement Act (FLREA), 16 U.S.C. § 460*l*-

6a.  Exh. EE at 20.

235.    The Forest Service previously stated to SCT that these public demands included, but were

not limited to, the need to:

> -address engine noise and noise from narration;
> -address air quality concerns expressed by the public; and
> -employ alternative vehicle technology, including motor vehicles that run on
> alternative fuels or electricity.

Exh. W.

236.    The Forest previously acknowledged that it was not economically feasible for a permit

holder to invest the significant sums needed to meet the public demands under a short length

permit.

237.    The Forest also stated in the final EA that it intended to issue up to a 20 year permit.

Exh. T at 33 ("The duration of this impact is always long term because the proposed duration of

shuttle operations identified in this analysis is 20 years"); *id*. at 71.

238.    The Forest then issued the Prospectus stating that the term will be for only five years.

Exh. EE.

239.    While the Prospectus refers to a possible option for an additional five years, bidders cannot rely upon receiving this option because it will only be granted at the sole discretion of the Forest.

240.    Therefore, the five year option is not a right of first refusal.  At best, the permit holder *might* get such a right at some point near the conclusion of the first five years.

241.    For purposes of preparing a proposal in response to the Prospectus, reasonable and prudent interested offerors will have to base their financial calculations on the permit continuing for only five years.

242.    The Forest acknowledged at the site visit held at Sabino Canyon Recreation Area on December 12, 2017, that it had failed to conduct any assessment as to whether the five year term of the permit was economically viable in light of the cost of new shuttle equipment which would have to be purchased pursuant to the Prospectus' requirements.

243.    The issuance of a five year permit discriminates against private small businesses, such as SCT, and favors large, well-funded or non-profit entities which may not need to recoup the investment required over the term of the permit.

244.    The decision to issue a permit with only a five year term was arbitrary, capricious and an abuse of any discretion the agency may have and a violation of the Term Permit Act of 1915 and the Forest Service's Organic Act because that decision contradicts the agency's prior acknowledgement that a permittee cannot feasibly meet the public's demands for new and improved shuttle equipment under a short length permit.  In addition, the Forest Service's decision contradicts the analysis in the EA of authorized shuttle operations for a period of 20 years to meet the changing public demands.

245.    The agency's determination is arbitrary and capricious and should be vacated and set aside under the APA.  5 U.S.C. § 706(2)(C).

## Count III

### *Violation of the National Environmental Policy Act*

246.    SCT repeats and re-alleges the allegations in paragraphs 1-245 as if set forth fully herein.

247.    The Forest Service has characterized Sabino Canyon Recreation Area, which borders the Pusch Ridge Wilderness Area, as being a unique desert environment based on its topography and climate.  Exh. T at iii.

248.    The area provides habitat for many species of plants and animals, including the federally-listed Gila chub, Gila topminnow and Western yellow-billed cuckoo.  *Id.*

249.    The Coronado National Forest considers Sabino Canyon to be the jewel of southeast Arizona.  *Id.*

250.    NEPA is designed to ensure that agencies make informed and well-considered decisions based on a thorough assessment of the environmental impacts flowing from those decisions.

251.    The current special use permit held by SCT authorizes it to own and maintain substantial improvements and structures within the Sabino Canyon Recreation Area.  Exh. A.

252.    These improvements and structures include the following:

        -a 14' x 70' fixed trailer used for the operations office;
        -a 12' x 60' building for equipment storage;
        -a 10' x 10' building for equipment storage;
        -a mechanical shop/building for repairing operation vehicles;
        -a fuel storage tank; and
        -a septic tank.

Exh. A at 1.

253.    These improvements also consist of several very large concrete slabs.

254.   SCT's current permit states that, if its authorization terminates and a new authorization is not issued, it will have to either sell or remove its structures and improvements and restore the site to the satisfaction of the Forest Service.   *See* Exhibit A at Sec. VII(F).

255.   The Forest issued its draft EA in September of 2016.  Exh. N.

256.   At the time the Forest issued the draft EA, the Forest had decided not to issue a competitive Prospectus for the permit to authorize continued shuttle services.

257.   At this time, the Forest's decision was to give SCT a right of first refusal to continue operating the shuttle service pursuant to a new permit.

258.   The draft EA stated, unequivocally, that no ground disturbing activities would occur as a foreseeable result of the agency's decision to continue with shuttle operations.

259.   Comments on the draft EA were due by October 12, 2016.

260.   SCT submitted comments to the draft EA on October 12, 2016.

261.   By letter dated May 31, 2017, the Forest informed SCT that the Forest had decided to issue a competitive Prospectus for the permit to continue shuttle operations.

262.   The Forest then issued a final EA on June 27, 2017.   Exh. T.

263.   The Final EA stated that it must:

> identif[y] the issues that serve to highlight effects or unintended consequences that may occur from the Proposed Action and alternatives, giving opportunities during analysis to reduce adverse effects and compare trade-offs for the decision-maker and public to understand.

Exh. T at 9.

264.   In that final EA, the Forest again asserted, unequivocally, that no ground disturbing activities would occur as a foreseeable result of the agency's decision to continue with shuttle operations.  Exh. T at 8, 11.

265.     However, because the Forest had changed its position between the time it issued the draft

EA and the time it issued the final EA as to its plan to issue a competitive Prospectus to

determine which entity would provide shuttle services, the assertion in the draft EA that no

ground breaking activities would occur as a result of the agency's action was incorrect.

266.     Ground disturbing activities were now a reasonably foreseeable outcome that may result

from the Forest's decision to issue a new permit to authorize the shuttle activities because it was

sufficiently likely that the Forest would not select SCT for the award of that permit.

267.     As a result, there was no basis to assume that SCT would chose to or be able to sell its

improvements to the new permit holder, or that the new permit holder would even want to

purchase those improvements.

268.     In that event, SCT would have to engage in significant ground disturbing activities in the

Sabino Canyon Recreation Area to remove those improvements.

269.     In addition, it is likely that a new operator will also need to construct new structures and

facilities in order to provide the necessary support and maintenance of its shuttle fleet.

270.     Therefore, NEPA required that the final EA identify and address these ground disturbing

activities which may occur as a foreseeable result of the Forest's decision to issue a competitive

Prospectus for the shuttle operations. *See* 40 C.F.R. § 1508.8 (requiring agency to review the

environmental impact of the reasonably foreseeable direct and indirect effects of its proposed

action).

271.     Because any decision to move forward with a new permit may result in removing the

existing improvements under the current Term Permit, this impact is a "connected action" and

must be assessed as part of the environmental analysis pursuant to NEPA.  40 C.F.R. § 1508.5;

*see* Forest Service Handbook 1909.15(15.1)(discussing need to assess cumulative effects of foreseeable related actions).

272.    The existing improvements that may be removed include several buildings as well as their concrete foundations.

273.    Without this analysis, the final decision maker was precluded from evaluating all of the likely environmental impacts of a decision not to select Alternative 3 and continue with SCT as the permit holder, but to instead select a new permit holder.

274.    In its objections to the final EA, SCT stated that the Forest had violated NEPA by failing to address in the final EA the impact of the foreseeable ground disturbing activities which would occur if the Forest did not select SCT for issuance of the new permit.  Exh. V.

275.    The Forest did not revise the final EA to address the environmental impacts related to the ground disturbing activity that would result from the removal of SCT's improvements and structures.

276.    The Forest's failure to evaluate the environmental impact on the Sabino Canyon Recreation Area from the extensive ground disturbing activities that may result from its decision to issue a competitive Prospectus constitutes a violation of NEPA.

277.    The agency's action was contrary to law and should be vacated and set aside under the APA.  5 U.S.C. § 706(2)(C).

### Count IV

278.    SCT repeats and re-alleges the allegations in paragraphs 1-277 as if set forth fully herein.

279.    The Forest Service is required and authorized by the Forest Service's Organic Act, 16 U.S.C. § 551 and the Term Permit Act of 1915,  16 U.S.C., § 497, and applicable sections of the

Forest Service Manual and Forest Service Handbook to issue authorizations for activities on the National Forests.

280.    Pursuant to this legal authority, the Forest Service issued the Prospectus on November 28, 2017 seeking applicants for the permit authorizing continued shuttle services at Sabino Canyon Recreation Area.  Exh. EE.

281.    The Forest Service stated that the purpose of the Prospectus was to seek offerors who could meet the "increasing and changing public demands for a shuttle system" in Sabino Canyon Recreation Area.  Exh. EE at 4.

282.    SCT is interested in submitting a proposal in response to the solicitation for offers to provide the shuttle services in Sabino Canyon Recreation Area.

283.    In the Regional Forester's letter dated May 31, 2017, and as confirmed by his subsequent letters dated August 15, 2017 and October 4, 2017 as well as by Deputy Chief Weldon's letter dated November 27, 2017, the Forest Service made an arbitrary and unfair determination that SCT was not capable of meeting these very same public demands as reflected in the subsequently issued Prospectus.  Exhs. B; R; W (at 3)("the Forest has determined that SCT [] was unable to meet increasing and changing public demands"); AA at 1 (SCT "has not demonstrated a commitment to meeting increasing and changing public demands for the SCRA shuttle system").

284.    As demonstrated above, the agency's decision was unreasonable because (1) the agency had not made a decision as to which if any public demands it wanted SCT to address at the time of its decision and (2) the agency had also admitted that obtaining expensive new shuttle equipment, such as vehicles with alternative motor vehicle technology, was not feasible under SCT's short length permits.

285.    The determination by the Forest Service that SCT has shown that it is not capable of meeting the same public demands which the agency was issuing the Prospectus to meet will prevent SCT from being fairly evaluated as an applicant for the permit to provide shuttle services in Sabino Canyon Recreation Area.

286.    The determination by the agency, which is illogical and contradicted by the record, is arbitrary, capricious, an abuse of any discretion the agency may have and not in accordance with law.

287.    The agency's determination should be vacated and set aside pursuant to the APA.  5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sabino Canyon Tours, Inc. and Donn Ricketts respectfully request that this Court grant the following relief:

(a)    issue an order finding that the USDA Forest Service violated the law, acted arbitrarily and capriciously, and abused its discretion in its determination that Sabino Canyon Tours, Inc. has shown that it is incapable of meeting the public demands as reflected in the Prospectus, and vacating and setting aside that decision;

(b)    issue an order finding that the USDA Forest Service violated the law, acted arbitrarily and capriciously, and abused its discretion in determination not to honor its written commitment to follow its longstanding policy and the Term Permit Act of 1915 based on the erroneous determination that Sabino Canyon Tours, Inc. has shown that it is incapable of meeting the public demands as reflected in the Prospectus was contrary to law, arbitrary, capricious and an abuse of any discretion the agency may have had, and vacating and setting aside that decision;

(c)     issue an order finding that the USDA Forest Service decision to issue a permit with only

a five year term was arbitrary, capricious and an abuse of any discretion the agency may

have and a violation of the Term Permit Act of 1915 and the Forest Service's Organic

Act, and vacating and setting aside that decision;

(d)     issue a preliminary injunction directing the USDA Forest Service to immediately suspend

any further efforts to proceed with seeking proposals in response to the Prospectus at

issue;

(e)     remand this matter to the USDA Forest Service to address and correct its arbitrary and

illegal actions as found by this Court and to proceed with its prior intentions to provide

Sabino Canyon Tours, Inc. with a right of first refusal with regard to any new permit to

provide shuttle services at Sabino Canyon Recreation Area; or, in the alternative, remand

this matter to the USDA Forest Service to address and correct its arbitrary and illegal

actions as found by this Court and revise the Prospectus to authorize a 20 year permit;

(f)     award Sabino Canyon Tours, Inc. and Donn Ricketts their costs and attorneys' fees

incurred in pursuing this action;

(g)     award Sabino Canyon Tours, Inc. and Donn Ricketts such further relief as this Court

deems just and proper; and

(h)     enter judgment in favor of Sabino Canyon Tours, Inc. and Donn Ricketts and against

Defendant.

Respectfully submitted,

 /s/ Kevin R. Garden
Dated:  December 22, 2017          Kevin R. Garden
DC Bar No. 426745
The Garden Law Firm, P.C.
901 N. Pitt Street, Suite 325
Alexandria, VA 22314

kevin@gardenlawfirm.com
Tel.:  (703) 535-5565
Fac.: (703) 997-1330

Counsel for Plaintiffs Sabino Canyon Tours, Inc.
and Donn Ricketts