**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SABINO CANYON TOURS, INC.** *et al.*,

    Plaintiffs,

    v.                                    Case No. 17-cv-2758 (CRC)

**USDA FOREST SERVICE**,

    Defendant.

## MEMORANDUM OPINION

For over thirty years, Sabino Canyon Tours, Inc. ("SCT") has held a permit to operate the shuttle system at Arizona's Sabino Canyon Recreation Area. In 2010, the U.S. Forest Service, which manages the Sabino Canyon Area, began planning to overhaul the shuttle service to respond to new public demands. This process culminated late last year with a finding that the proposed shuttle upgrades would have no significant impact on the environment and the issuance of a Prospectus seeking competitive bids for a new five-year permit to run the service. SCT— whose current permit expires in June 2018—brought suit against the Forest Service and has filed a motion for a preliminary injunction seeking to enjoin the bidding process. Because SCT has not shown either a likelihood of success on the merits of its claims or irreparable harm in the absence of an injunction, the Court will deny the motion.

## I.    Factual Background

The Sabino Canyon Recreation Area is a national park located in Tucson, Arizona in the foothills of the Santa Catalina Mountains. Def.'s Mem. Opp'n Pls.' Mot. Prelim. Inj. ("Def.'s Opp'n") Ex. A ("Environmental Assessment"), at iii. It encompasses over 12 miles of trails as well as Sabino Creek, which serves as a habitat for several endangered species including the Gila chub and Western yellow-billed cuckoo. Id. The park has been hailed by the U.S. Forest

Service ("Service") as the "jewel of southeast Arizona" and attracts more than a million visitors annually. Id.

In 1978, following vehicular congestion and safety concerns, the Service closed the roads within the Sabino Canyon Area to private motorized traffic and initiated a private shuttle system to allow visitors access into the canyon. Pls.' Mem. Supp. Mot. Prelim. Inj. ("Pls.' Mot.") Ex. G ("2010 Volpe Study"), at 5. In 1982, Sabino Canyon Tours, Inc., which is owned by plaintiff Donn Ricketts (collectively "SCT"), received a permit to operate the shuttle service in the park. Def.'s Opp'n Ex. C. This would be the first in a series of permits that continues to the present. The 1985 permit, which lasted for a term of ten years, see id., was renewed until 2007. In 2007 and 2008, SCT received two successive one-year permits. See id. Ex. D, E. These were followed, in August 2009, with a permit lasting until December 31, 2013. See id. Ex. F.

Around the time that it renewed SCT's permit in 2009, the Service began to analyze the existing transportation situation at Sabino Canyon Area and formulate a plan to revise and update it. See generally 2010 Volpe Study at i. This process culminated in a study issued in 2010 by the U.S. Department of Transportation's Volpe Center (the "2010 Volpe Study"). The study gathered data on visitor numbers and patterns, the environment of the Canyon Area, and the existing shuttle service. Id. at 7–25, 33–39. Guided by five "fundamental themes"—public safety; infrastructure preservation and management; mobility, accessibility, and connectivity; visitor experience; and environmental stewardship, id. at 54—the study proposed four possible actions: (1) parking management and capacity control, (2) expanded non-motorized use of park roads; (3) a fare-free shuttle service; and (4) infrastructure improvements. Id. at 65.

The study also identified a variety of concerns with the ongoing shuttle service. For instance, it recounted "numerous" visitor complaints about the shuttle's exhaust fumes, noting

that the tram vehicles SCT used at the time had been in operation since 1985.  Id. at 55, 57, 68, 70, 106, 111.  The study similarly noted numerous complaints about noise from the shuttle's narration service disturbing visitors not on the shuttle.  Id. at 55, 57, 66, 70, 106.  Visitors also complained about the fact that the shuttle service only accepted cash, particularly given the lack of an ATM in the park.  Id. at 57.  The study recommended several specific ways to improve the shuttle in response to these concerns, such as "[r]equir[ing] the tram vehicles to conform to specified noise and air quality requirements," id. at 130; replacing the existing vehicles, id. at 143–44; and upgrading the tram narration method and technology, id. at 146.

In September 2012, about one year before its existing permit was set to expire, SCT wrote to the Service requesting a renewal.  Pls.' Mot. Ex. H, at 3.  This request was followed by a May 1, 2013 letter from SCT's counsel Kevin Garden.  Id. at 4.  The Service responded in a letter dated May 29, 2013, explaining that it had "embarked on substantial evaluation and future planning of the transportation needs in Sabino Canyon."  Id. at 1.  In particular, the Service indicated that it was "working toward implementing recommendations made" in the 2010 Volpe Study, which "highlight[ed] opportunities for expanded routes and schedules, use of alternative energy vehicles, and a new service to accommodate [the] growing Children's Forest programs."  Id. at 1–2.  The Service stated that it was declining to renew the permit because it intended to advertise a competitive prospectus in the summer of 2013.  Id.  As time passed, however, the Service realized that "[t]he concept planning process and environmental analysis" for any changes to the transportation system would "take additional time" and, on November 12, 2013, renewed SCT's permit for an additional 18 months.  Id. Ex. F.

By the time that permit was set to expire, the Service still had not completed the environmental analysis and planning process.  See id. Ex. I, at 3.  SCT, once again facing the end

of its permit term, wrote to the Service in April 2015 requesting a long-term extension of ten to fifteen years.  Id. at 1.  Service employees subsequently met with SCT's owner Mr. Ricketts and counsel Mr. Garden on June 1, 2015 regarding the shuttle service situation.  Id. Ex. L, at 1; id. Ex. M, at 1.  During that meeting, the parties addressed the Service's ongoing environmental assessment process.  Id. Ex. L, at 2; id. Ex. M, at 1.  They also discussed concerns that visitors had raised about the shuttle service, including the vehicles' "engine noise and diesel fumes," that the narration "volume is loud and diminishes the experience of some visitors not on the shuttle," and how visitors are "limited to paying with cash" for tickets.  Id. Ex. M, at 3.  Mr. Ricketts agreed to "look into" ways to resolve these issues.  Id.  SCT's permit was renewed that month for another two-year period.  Id. Ex. D.

During the next two years, the Service made significant progress in the planning and environmental analysis process.  In September 2015, the Service released the Sabino Canyon Sustainable Recreation Concept Plan.  See id. Ex. N.  A year later, in September 2016, the Service released a draft environmental assessment of its proposed changes to the park's transportation system.  See id. Ex. O.  But as SCT's permit once more neared its expiration date in June 2017, the process had still not been completed.  On May 31, 2017, the Service's Regional Forester Calvin Joyner wrote to Mr. Ricketts notifying him that the Service ultimately planned to issue a competitive prospectus once the environmental planning process was completed and that it would like to renew SCT's permit another year until June 30, 2018 (and, if necessary, one more year after that until June 30, 2019) to ensure continuity in service until a new provider could be selected.  Id. Ex. S.

SCT strongly objected to the Service's decision to issue a competitive prospectus.  In a June 19, 2017 letter from its counsel Mr. Garden, SCT complained that the Service had "broken

an explicit commitment" to SCT to have the "opportunity to meet" changing public demand "under a new long term permit." Id. Ex. W, at 21–22. SCT claimed that the Service made such a commitment in a September 27, 2013 letter from Service Deputy Chief Leslie Weldon to Marily Reese, the Executive Director of the National Forest Recreation Association. Id. at 22; see id. Ex. E. In its response to Mr. Garden, the Service denied making any commitment to grant a long-term permit to SCT and explained its decision to issue a Prospectus by noting that SCT had not demonstrated its ability to meet changing public demands and resolve the concerns laid out in the 2010 Volpe Study and related documents. Id. Ex. X, AA, FF.

That summer and fall—while the Service and SCT exchanged letters—the Service completed the environmental analysis and planning process for the shuttle service. On June 27, 2017 the Service released its final Environmental Assessment for the shuttle service. On November 3, 2017, the Service issued its Notice of Decision and Finding of No Significant Impact. Id. Ex. Z. Finally, on November 28, 2017, the Service issued a prospectus accepting bids for the operation of the shuttle service in Sabino Canyon Area. Id. Ex. BB.

One month later, SCT and its owner Donn Ricketts brought suit against the Forest Service under the Administrative Procedure Act ("APA"). They raised four claims under an assortment of statutes, including an allegation that the environmental assessment process violated the National Environmental Policy Act ("NEPA"). Just over a week after bringing suit, on December 31, 2017, SCT filed a motion seeking a preliminary injunction enjoining the prospectus bidding process. It requested a hearing and a ruling before January 26, 2018, when the bidding period closed. See Pls.' Mot. Prelim. Inj. at 2. The Court issued a briefing schedule and held a hearing on January 22.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction thus bears the burden of making a "clear showing that [he] is entitled to such relief." <u>Id.</u> at 22. To make such a showing, the party must establish: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." <u>Sherley v. Sebelius</u>, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting <u>id.</u> at 20). Ultimately, the purpose of a preliminary injunction "is to preserve the object of the controversy in its then existing condition—to preserve the status quo." <u>Aamer v. Obama</u>, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (citation omitted).

## III. Analysis

The Court will begin with the likelihood of success and irreparable harm requirements for a preliminary injunction. Finding that SCT has met neither, the Court need not consider the balance of equities or the public interest.

### A. <u>SCT does not demonstrate a likelihood of success on its claims.</u>

SCT's complaint raises four claims. Counts One and Four "are based on the Forest Service having acted arbitrarily, capriciously and not in accordance with law . . . when it determined that SCT had shown it was unable to meet the public's demands." Pls.' Mot. at 20; <u>see</u> Compl. ¶¶ 229, 285–87. Count Two alleges that the Service acted arbitrarily by issuing a Prospectus that "fails to provide a sufficiently lengthy term to allow private businesses to recoup the financial investment required to meet its terms." Pls.' Mot. at 32; <u>see</u> Compl. ¶ 244. And Count Three alleges that the Service violated NEPA by failing to account for ground-disturbing

effects from SCT's removal of structures that it has built on the park grounds, which SCT says will be necessary if it does not receive a new permit.  Compl. ¶¶ 264–70.

For the reasons that follow, the Court concludes that SCT has not established a likelihood of success on its APA claims[1] because (1) it has not shown it is challenging final agency action and (2) it has not shown that the Service has acted arbitrarily and capriciously or contrary to law. And SCT has not established a likelihood of success on its NEPA claim because (1) it has not demonstrated a particularized injury from the alleged NEPA violation and (2) its NEPA claim is not yet ripe.

*1.  SCT has not demonstrated a likelihood of success on its APA claims.*

SCT raises three APA claims that invoke statutes other than NEPA; two of these relate to the purported determination by the Forest Service that SCT cannot meet changing and increasing public demands and the other relates to the Service's decision to set a five-year term for the permit in the Prospectus.  SCT has failed to demonstrate a likelihood of success on these claims because (1) it has not clearly established that it is challenging final agency action and (2) it has not shown the Service acted arbitrarily and capriciously or contrary to law by not offering SCT a new long-term permit and instead issuing the Prospectus.

a.  <u>SCT has not established that it is challenging final agency action.</u>

In order for a claim to lie under the APA, a plaintiff must challenge final agency action. <u>See</u> 5 U.S.C. § 704.  While the lack of finality does not defeat the Court's subject matter jurisdiction, <u>see</u> <u>Trudeau v. FTC</u>, 456 F.3d 178, 185 (D.C. Cir. 2006), it still results in the

---

[1] While the Court recognizes that, technically speaking, all of SCT's counts invoke the APA as a cause of action, for clarity and ease of reading it will refer to SCT's APA claim invoking NEPA as its "NEPA claim" and to its other three claims as its "APA claims."

dismissal of a party's APA claims for lack of a valid cause of action, see, e.g., Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 253 (D.C. Cir. 2014).  To be duly final—and thus to sustain a valid cause of action—the challenged agency action must meet two requirements:  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  U.S. Army Corps of Eng'rs v. Hawkes, Co., 136 S. Ct. 1807, 1813 (2016) (citation omitted).

With respect to this second criteria, the fact that an agency action has *practical* effects or consequences is insufficient.  See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 811 (D.C. Cir. 2006).  Rather, the Supreme Court has made it "quite clear that agency action is only final if it determines 'rights or obligations' or occasions '*legal*' consequences."  Id. (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)) (emphasis in original). "[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final."  Id. (citation omitted).

SCT attempts to locate final agency action in Regional Forester Joyner's August 15, 2017 letter to its counsel, Mr. Garden (the "Joyner Letter").[2]   In the letter, Regional Forester Joyner responds to Mr. Garden's objections to the Service's decision to issue a competitive prospectus in part by noting that "the Forest [Service] has determined that SCT has not demonstrated its ability to meet" the public demands identified in the Volpe Study and elsewhere.  Pls.' Mot. Ex. X.  SCT contends that the determination expressed in the Joyner Letter constituted final agency

---

[2] While the Service first announced its intention to solicit bids for a competitive Prospectus to SCT in a May 31, 2017 letter to Mr. Ricketts, it did not lay out its conclusion that SCT had failed to demonstrate its ability to meet public demands until the Joyner Letter.

action because it both "marked the consummation of the agency's decision making process" and "had legal consequences."  Pls.' Reply at 7.  As to the latter requirement, SCT argues that two legal consequences flowed from the Joyner Letter.

First, SCT asserts that the letter reneged on a prior commitment by the Forest Service to allow SCT to demonstrate its ability to upgrade the shuttle service under a long-term contract.  But any suggestion that the Joyner Letter somehow altered SCT's legal rights rests on the erroneous premise that SCT was legally entitled to continue to operate the shuttle in the first place.  Clearly no such right was created by the existing permit, which explicitly states that it "does not provide for renewal" and that "renewal of the use and occupancy authorized by this permit shall be at the sole discretion of the authorized officer."  Pls.' Mot. Ex. D, at I.D.

Recognizing as much, SCT suggests instead that the Forest Service created a legal entitlement by providing "written assurance to SCT that . . . SCT would be given the opportunity to continue its operations under a successive Term Permit."  Pls.' Mot. at 23.  Specifically, SCT points to a September 27, 2013 letter from the Forest Service's Deputy Chief, Lesley Weldon, to Marily Reese, the Executive Director of a trade association who had written the Forest Service to express concern over the Service's failure to issue SCT a long-term permit.  In the letter, Weldon advised Reese of the Service's ongoing analysis of potential enhancements to the park's transportation system and indicated that the Service would "continue to engage with [SCT] to examine opportunities to expand their operations to meet changing public demands."  Pls.' Mot. Ex. E.  Weldon concluded the letter by stating: "If [SCT] is unable to meet those demands, we plan to solicit for additional providers."  Id.

SCT seizes on this concluding sentence, arguing that it created some sort of legal entitlement to a continuation of the shuttle service under a new long-term contract.  Pls.' Mot. at

23; see also id. at 24 ("In her letter, the Deputy Chief clearly exercised her authority to commit to SCT that it would be given the opportunity, as part of a long term Term Permit, to agree to criteria to be determined."). But the cited sentence does not bear the weight that SCT places on it. For one, Deputy Chief Weldon's letter is directed to a third party, not to SCT. SCT cites no authority for the proposition that an agency's expression of intent to work with a concessionaire in a letter to a third party creates a legally binding commitment to that concessionaire. And even assuming a third-party letter could create a contractual commitment to SCT, it did not, as SCT contends, constitute a promise to extend SCT a long-term permit. The letter nowhere mentioned a *long-term* permit and said nothing about *renewing* SCT's then existing permit. Rather, it simply articulated a course of conduct if certain events came to pass: If SCT was unable to meet the public demands that had been identified, the Service would solicit for other providers. At the very most, the letter committed the Service to engage with SCT and may have created an expectation on the part of SCT that it would be given a chance to obtain another permit. But it did not legally obligate the Forest Service to extend one. Because SCT had no legal right to a long-term permit, the assessment in the Joyner Letter four years later that SCT had not shown an ability to meet public demands, and therefore that the permit should be open to competition, did not cause SCT a legal injury.

Second, SCT argues that even if the Joyner Letter did not effect a breach of a legal entitlement to a long-term permit, it still carried a legal consequence because it prejudiced SCT's ability to compete under the Prospectus and thereby deprived it of a "right to a fair evaluation for this government opportunity." Pls.' Reply at 10. SCT asserts that the Joyner Letter laid out "the determination by the Forest Service that SCT has shown it is not capable of meeting public needs" and that this finding will effectively prevent SCT from winning a competitive bid. Id. at

7.  That is so, SCT contends, because the panel that will review the bids is encouraged to seek out performance evaluations of the competitors' past contracts, Pls.' Mot. Ex. BB, at 35, and therefore the panel will likely receive the Joyner Letter.   This in turn will taint the bidding process because no panel would select SCT in light of the letter's finding.

This argument fails as well.  Even if the Joyner Letter could be viewed as a de facto performance evaluation, the fact that it might somehow influence the selection panel is not a legal consequence.  The letter does not alter SCT's legal rights or obligations, or affect its legal position vis-à-vis other bidders.  Otherwise, any negative performance evaluation of a government contractor would be subject to APA challenge on the ground that it might hurt the contractor's chances to obtain future contracts.  Not surprisingly, SCT cites no precedent for that result.  While it is true that agency "determination letters" can constitute final agency actions, they do so only if they carry some legal consequence.  See, e.g., Hawkes, Co., 136 S. Ct. at 1814 (holding that Corps of Engineers positive "jurisdictional determination" letter had legal consequences because it denied the recipient the benefit of a five-year safe harbor from suit for Clean Water Act violations); Rhea Lana, Inc. v. Dep't of Labor, 824 F.3d 1023, 1032 (D.C. Cir. 2016) (holding that agency determination letter had legal consequences because it "render[ed] [the plaintiff] a candidate for civil penalties").  That is not the case here:  whatever sway the Joyner Letter might possibly have on the selection panel is simply not a legal consequence triggering final agency action.

In any event, the Court is not persuaded that the Joyner Letter precludes SCT from competing fairly if it chose to submit a bid.  The letter says that "[b]ased on the 2013 Volpe

Center study[3] and the 2015 Sustainable Recreation Concept Plan, and as reflected in the EA and [its] May 31 letter, the [Service] has determined that SCT *has not demonstrated* its ability to meet those [public] demands." Id. at 3 (emphasis added); see also id. ("Page 2 of the June 19 letter acknowledges that SCT has not demonstrated its ability to meet these demands[.]"). A similar letter sent from Deputy Chief Weldon to Mr. Garden on November 27, 2017 states that "[t]he [Service] appropriately decided to issue a prospectus as the [Service] has determined that SCT *has not demonstrated* its ability to meet increasing and changing public demands based on the 2010 Volpe Center study and the 2015 Sustainable Recreation Concept Plan." Id. Ex. AA (emphasis added); see also id. Ex. FF (Oct. 4, 2017 letter from Regional Forester Joyner to Mr. Garden) ("Sabino Canyon Tours (SCT) has not demonstrated a commitment to meeting increasing and changing public demands for the SCRA shuttle system.").

The Joyner Letter, as well as the other letters rearticulating the Service's position, thus does not represent a conclusion by the Service that SCT is *incapable* of meeting changing and increasing public demands, or that any proposal submitted by SCT for a new permit would not be duly considered.[4] Rather, the Joyner Letter simply determined that SCT had not yet demonstrated its capability. In other words, the message being conveyed by the Service (fairly or not) was that because the same concerns about the shuttle service that had been raised as early as 2010 still persisted seven years later, the Service was following through on its oft-stated intention to bid the service competitively. Nothing in that statement prevents SCT from demonstrating its capabilities by submitting a proposal that adequately responds to the public

---

[3] The Court assumes this is a typo and the letter meant to reference the *2010* Volpe Study.

[4] The Court is unaware of whether SCT submitted a bid application by the January 26, 2018 deadline.

demands reflected in the Prospectus.  The Service recognizes as much in its opposition here.  See Def.'s Opp'n at 28 ("[A] determination about SCT's current performance does not disqualify it from demonstrating its ability to meet public demands in the future in its application under the prospectus.").

As the Joyner Letter itself says, the Service's ultimate conclusion was that SCT had not demonstrated, at that point in time, that it could meet changing and increasing public demands. And the conclusion that SCT *had not demonstrated* its capacity is not the same thing as the conclusion that SCT *could not demonstrate* its capacity, *i.e.*, that SCT is incapable of meeting public demands.  To paraphrase the saying, absence of evidence is not proof of absence.  SCT remained free to submit a proposal to the Prospectus that shows such capability.  Thus, while being barred altogether from participating in a bidding process may well be final agency action, SCT has not established that the letters have that effect here.  As such, SCT points to no legal consequences that flow from these letters, indicating it has not shown a likelihood that it is challenging final agency and, consequently, of success on the merits.

b. <u>SCT does not show a likelihood of success on the merits of its APA claims.</u>

Even assuming that SCT has challenged final agency action, the Court finds that it has not demonstrated likely success on the merits of its APA claims.  It will start with SCT's second claim—which relates to the length of the term permit in the Prospectus—before moving to its first and fourth claims—which relate to the Service's alleged determination concerning SCT's capacity to meet public demands.

*i. Five-year permit length.*

SCT's second claim challenges the five-year permit length in the Prospectus.  At the hearing, SCT's counsel conceded that no legal authority precludes the Service from selecting a

five-year term.  Rather, SCT contends that the Service's choice of five years is arbitrary and capricious because the Service "previously acknowledged that it was not economically feasible for a permit holder to invest the significant sums needed to meet the public demands under a short length permit."  Pls.' Mot. at 33.

But SCT does not point to anywhere that the Service made such an acknowledgement—and cites nothing in its brief to support this assertion, see Pls.' Mot. at 33–34.  The closest possible supporting evidence is a series of letters related to the June 1, 2015 meeting between the Service and SCT.  See id. Ex. Y.  Following this meeting, SCT's counsel Mr. Garden wrote to the Service summarizing the discussion.  See id. Ex. L.  His letter recounted:

> For the past nine years, there have been numerous short-term permits issued.  These continuous short-term permits have impeded Donn[] [Ricketts'] ability to make significant investments in new trams, sound systems, and other improvements the Forest Service would like to see because financing such investments is dependent on the length of the permit.  Everyone at the meeting on June 1 recognized and agreed that a long-term permit is necessary to amortize such investments.  Until that long-term permit is issued, the current situation will continue.

Id. Ex. L, at 8.  Acting Forest Supervisor Jamie Kingsbury responded to Mr. Garden by letter on June 24, 2015, stating that Mr. Garden's letter "provided an excellent summary of the meeting." Id. Ex. M at 3.  Kingsbury also "acknowledge[d] that the past practice of short term extensions to Sabino Canyon Tours authorization has been problematic for Mr. Ricketts." Id. at 1.

At most, these letters indicate that the Service recognized that *SCT* would not be able to purchase new equipment without a longer term permit.  That is not the same thing as recognizing that it is *economically infeasible* to do so.  In other words, SCT's purported inability to amortize the purchase of new equipment under a five-year permit does not automatically mean that every single company is similarly unable to do so.  After all, different contractors might have alternative means of funding or better access to the necessary equipment.  SCT's counsel

acknowledged at the hearing that some companies—such as larger corporations or municipal entities—could be able to provide such service in a five-year term.  Thus, without further evidence, SCT's inability to meet the changing public demands on a five-year permit is insufficient to show that no one can.

SCT further contends that the five-year term is unreasonable because it is unfair to small businesses like SCT.  At the hearing, counsel worried that only larger corporations or municipal entities could meet the terms of the bid, making it an unfair prospectus.  But it cannot be the case that as a matter of law every government proposal must be one that *every* company has a chance of meeting.  After all, the government's needs may be such that only certain types of companies—sufficiently large ones or sufficiently specialized ones, for instance—can satisfy them.  Surely the government is not precluded from pursuing a bid process that has an incidental effect of precluding some companies or types of companies from competing because of the nature of the government's needs.  Given that no legal authority prevents the Service from selecting a five-year term—and it is certainly logical that the Service might not want to commit to a longer term—the fact that such a term might have the practical side effect of preventing certain companies from entering winning bids does not render the Prospectus arbitrary and capricious.

In sum, SCT points to no evidence that would suggest it is economically infeasible to perform the Prospectus's services with a five-year permit.  Nor is the fact that some businesses might not be able to meet the Prospectus's terms under a five-year permit likely enough to render the Prospectus arbitrary and capricious.  SCT consequently fails to show a likelihood of success on its argument that it was arbitrary and capricious or an abuse of discretion for the agency to select a five-year term.

*ii.   SCT's ability to meet public demands.*

SCT has similarly failed to show a likelihood of success on the merits of its other two

APA claims.  In its first and fourth claims, SCT contends that the Service "acted arbitrarily,

capriciously and not in accordance with law . . . when it determined that SCT had shown it was

unable to meet the public's demands."  Pls.' Mot. at 20.  It argues that because this determination

"was flatly contradicted by the record," the Service "had no valid or reasonable basis to renege

on its commitment to SCT (and upon which SCT relied) that the agency would . . . give SCT an

opportunity to agree to meet those changes designated by the agency under a new, long-term

Term Permit."  Id. at 20–21.  The Court agrees with the Service that SCT has not made out a

substantial likelihood of success as to these claims.

First, the Court is not persuaded that SCT has demonstrated that the Service ever *made* a

commitment to give SCT a new long-term permit.  Once again, SCT relies primarily on the

September 27, 2013 letter from Deputy Chief Weldon to Ms. Reese, contending that "the Deputy

Chief clearly exercised her authority to commit to SCT that it would be given the opportunity, as

part of a long term Term Permit," to show it could meet public demands.  Pls.' Mot. at 24.  But

as discussed above, that letter does not establish *any* legally-binding commitment to SCT.  See

*supra* Section III.A.1.a.

Second, the Court is not persuaded that SCT has demonstrated a likelihood of succeeding

in its argument that the Service's contention that it had not met changing public demands is

arbitrary and capricious.  SCT argues that the Service reached this decision, as reflected in the

August 2017 Joyner Letter, before even deciding what these public demands were, making it

"impossible for SCT to have known, much less respond to, what public demands it was supposed

to address."  Pls.' Mot. at 25.  But as the Court discussed above, the Service never determined

that SCT is *incapable* of meeting these demands going forward. Rather, it concluded that SCT *had not demonstrated* its capability of doing so as of the time of that letter. See Pls.' Mot. Ex. X, AA. And given that SCT had been aware of the Service's concerns for years—making it hard to claim it was blindsided by them now—and points to no changes it has made in response to those concerns, it is unlikely to succeed in arguing that that conclusion was wholly unfounded.

For one, the concerns that the Service wanted addressed—such as the need for less intrusive narration technology, multiple means of fare collection, and better exhaust quality, id. Ex. BB at 10–11, 13—had been discussed for several years prior to the Joyner Letter. These issues were first raised in the 2010 Volpe Study, see, e.g., 2010 Volpe Study at 55, 57, 68, 111–12, 130–33, and were further discussed in the Service's 2015 plan for the Sabino Canyon Area, see Pls.' Mot. Ex. N, at 9–10.

Moreover, SCT has itself expressed awareness of these concerns. For instance, a May 28, 2015 email from SCT's counsel Mr. Garden to Service employees stated that SCT was "very much interested in looking into purchasing new shuttles that address concerns raised by some members of the community." Pls.' Mot. Ex. J. Similarly, the Service's June 24, 2015 letter summarizing the June 1, 2015 meeting with SCT states that the parties discussed how "[s]huttle engine noise and diesel fumes negatively effect[] visitor experience and the natural environment," "[s]huttle speaker volume is loud and diminishes the experience of some visitors not on the shuttle," and "[s]huttle tickets can only be purchased at a single location, [and] are limited to paying with cash." Id. Ex. M at 3. SCT agreed to explore ways to address these issues. Id. SCT has therefore been aware for several years of the issues that the Service wanted addressed.

In sum, SCT has been aware of the Service's concerns since at least 2015, if not 2010. Yet it points to no changes it has made to address these concerns. Given this, it is unclear why the Service was arbitrary or unreasonable in concluding that SCT had not demonstrated its ability to meet these demands.

### 2. *SCT does not show a likelihood of success on its NEPA claim.*

In addition to its three other APA claims, SCT also raises a claim under NEPA. It argues that the Service's environmental assessment and finding of no significant environmental impact violated NEPA because it failed to account for the environmental impact caused by the removal of permanent structures that SCT built on the park grounds over the years, which SCT claims would be necessary under the terms of its current permit if it does not obtain a new one, see Pls.' Mot. Ex. D, at 16. The Court concludes, however, that SCT has not shown a likelihood of success on this claim because (1) it has not established a particularized, concrete injury sufficient to establish standing and (2) the claim is not prudentially ripe.

### a. SCT has not established a particularized, concrete injury.

The Service argues, first, that SCT has failed to allege an injury sufficient to provide it standing, and therefore fails to demonstrate that the Court has jurisdiction. A party invoking the Court's jurisdiction bears the burden of proving standing. WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013). Constitutional standing has three requirements: (1) that the party has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (quoting Lujan

v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). Standing "'is not dispensed in gross' but instead may differ claim by claim." West v. Lynch, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (citation omitted).

A plaintiff alleging a procedural violation of NEPA, as here, must demonstrate a "concrete injury that is 'tethered to' the [agency's] decision to authorize" the underlying action "notwithstanding the [agency's] allegedly inadequate NEPA review." Sierra Club v. FERC, 827 F.3d 36, 44 (D.C. Cir. 2016) (citation omitted); see also WildEarth Guardians, 738 F.3d at 305 ("A procedural injury claim therefore must be tethered to some concrete interest adversely affected by the procedural deprivation[.]"). SCT alleges that it has met this requirement here, pointing to a declaration from Mr. Ricketts stating that he is "a frequent visitor to SCT Recreation Area," "intend[s] to frequently visit the area in the future," and "enjoy[s] the natural environment at Sabino Canyon and [is] very concerned about it not being disrupted." Ricketts Decl. ¶¶ 2–3; see also Compl. ¶ 25 ("Plaintiff Donn Ricketts is . . . a resident of Tucson, a frequent visitor to Sabino Canon Recreation Area and intends to frequently visit the area in the future.").

While Mr. Ricketts may well have an individual concern for the Sabino Canyon environment, he has not demonstrated a concrete and particularized injury that is tethered to the procedural violation SCT alleges here. Neither SCT nor Mr. Ricketts ever explain what the impact of any removal of structures in the park would have—other than that it would be "ground-disturbing"—or why Mr. Ricketts would be harmed by it. Mr. Ricketts' declaration fails to link any of the potential ground-disturbing activities to his interest in or enjoyment of the Sabino Canyon Area or to any specific harm to the environment there. In other words, Mr. Ricketts never articulates *how* his interest in and enjoyment of the Sabino Canyon area would be

at all affected by the challenged actions. This paucity of detail stands in contrast to the more

fulsome declarations submitted in cases where a plaintiff did establish standing. Cf., e.g., Sierra

Club, 827 F.3d at 44 (holding that the "specific factual representations" in plaintiff's

declaration—which established that she resided a half-mile from the proposed construction site

and that the noise and construction would hinder her enjoyment of her home and keep her from

going outside to relax or walk on the beach by her home as frequently—sufficed to establish

standing).

Ultimately, without an articulation of how any potential ground-disturbing activities will

injure Mr. Ricketts's enjoyment of the Sabino Canyon area, SCT has not alleged a *concrete*

particularized injury. Pointing to a procedural violation and a general concern for the

environment is simply not sufficient.[5]

### b. SCT's NEPA claim is not ripe.

The Service further contends that even if SCT has standing, it cannot show a substantial

likelihood of success on the merits because its NEPA claim is not ripe. It argues that because no

final decision has been reached on the permit—and SCT could still receive it—it is not certain

whether there would even be a need to remove any structures in the park. Def.'s Opp'n at 16. If

---

[5] Arguably, SCT's other claimed injuries have a causal connection to the decision that followed the environmental analysis. However, "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" Lexmark Int'l, Inc. v. Static Control Components, 134 S. Ct. 1377, 1388 (2014) (citation omitted). The economic and competitive harms that SCT points to are not within the zone of interests of NEPA and therefore cannot suffice to provide standing for its NEPA claim. See Gunpowder Riverkeeper v. FERC, 807 F.3d 267, 274 (D.C. Cir. 2015) ("The zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone.").

SCT is successful in obtaining the permit, no assets will need to be removed and no ground disturbances will occur.  Id.  The Court agrees.

In addition to requiring that the plaintiff has standing, Article III also demands that a case be ripe for review.  Ripeness has both a constitutional and a prudential aspect.  See, e.g., Am. Petroleum Inst. v. EPA, 683 F.3d 382, 386 (D.C. Cir. 2012).  With respect to prudential ripeness, the doctrine serves to allow "the administrative process [to] run its course before binding parties to a judicial decision."  Id.  Thus, courts hesitate to interfere when "there is still time for the challenging party to 'convince the agency to alter a tentative position.'"  Id. at 387 (citation omitted).  Even if the agency does not change its mind, "permitting the administrative process to reach its end can at least solidify or simplify the factual context and narrow the legal issues at play."  Id.  When determining prudential ripeness, the Court looks to two factors:  "the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'"  Id. (citation omitted).

SCT contends that the Service failed to account for ground-disturbing activities that would take place if it lost its permit.  It explains that if it loses its permit, it will need to remove structures it has built, including several concrete slabs.  But, again, it is not certain that SCT will fail to receive a permit, as discussed above.  And even if SCT does not receive a permit, it is still uncertain that SCT will need to remove its structures.  As SCT itself recognizes, a future provider is likely to need the existing structures to furnish service just as SCT did.  See Compl. ¶ 269 (if the structures are removed "it is likely that a new operator will also need to construct new structures and facilities in order to provide the necessary support and maintenance of its shuttle fleet").  These contingencies make this just the sort of case that "would benefit from further factual development of the issues presented" prior to resolution, Wyoming Outdoor

<u>Council v. U.S. Forest Serv.</u>, 165 F.3d 43, 48–49 (D.C. Cir. 1999) (citation omitted).  Nor has SCT articulated any harms from waiting to resolve its NEPA claim—no environmental harm would occur until later, and SCT points to no tangible injuries it suffers (within the zone of interests of NEPA) from having to compete for a permit.  As such, the Court is not persuaded that this claim is ripe for review, which further indicates that SCT has not demonstrated a likelihood of success on its NEPA claim.

B.  <u>SCT does not demonstrate irreparable injury.</u>

The Court now turns to the requirement that SCT demonstrate irreparable injury justifying a preliminary injunction.  To obtain a preliminary injunction, a plaintiff must demonstrate that she "would suffer irreparable injury if the injunction were not granted." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit "has set a high standard for irreparable injury." <u>Id.</u>  First, the injury "must be both certain and great; it must be actual and not theoretical." <u>Id.</u> (citation omitted).  That is, the injury must be "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." <u>Id.</u> (citation omitted).  Second, the injury must be irreparable, meaning that it is "beyond remediation" and that it not likely that "'adequate compensatory or other corrective relief will be available at a later date.'" <u>Id.</u> (citation omitted).  The Court finds that SCT has not articulated an irreparable harm attributable to either its APA claims or its NEPA claim.

*1. SCT does not demonstrate irreparable harm as to its APA claims.*

With respect to its APA claims, SCT primarily alleges that it will suffer irreparable harm by having to undergo a tainted bidding process. <u>See, e.g.</u>, Pls.' Mot. at 37.  As an initial matter, the Court doubts that having to participate in a tainted bidding process automatically constitutes an irreparable harm. See <u>C.S. McCrossan Constr., Inc. v. Minn. Dep't of Transp.</u>, 946 F. Supp.

2d 851, 858–59 (D. Minn. 2013) (rejecting contention that having to undergo an unfair bidding process is automatically an irreparable harm and noting that other courts have been skeptical of this argument); OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) ("Mere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury, however; if they were, any bid protest would involve an irreparable injury."). Having to undergo a tainted bidding process is surely an *injury*. See, e.g., Eco Tour Adventures, Inc. v. Jewell, 174 F. Supp. 3d 319, 329 (D.D.C. 2016). But that does not necessarily make it an *irreparable* one.

In any case, SCT has not shown there is a tainted bidding process here. SCT points again to the Joyner Letter informing SCT that the shuttle permit will be put to a competitive bid. As discussed above, however, the letter did not preclude SCT from submitting a proposal or prevent any proposal it did submit from being selected. It simply states that SCT had not demonstrated its ability to meet changing and increasing public demands. It says nothing about SCT's ability to submit a proposal demonstrating it can meet those demands going forward or to submit a proposal that will win the bid. Thus, even if having to undergo a tainted bidding process is an irreparable injury, SCT suffers no such injury here.

The cases that SCT cites are not to the contrary. Many of them involve parties prevented wholesale from bidding or excluded from consideration entirely. See O'Donnell Const. Co. v. District of Columbia, 963 F.2d 420, 422 (D.C. Cir. 1992) (non-minority business challenged D.C. law setting aside contracts for minority businesses only); Veterans Contracting Grp. v. United States, 133 Fed. Cl. 613, 623 (2017) (party sought to be reinstated as a qualified service-disabled veteran-owned small business so as to "allow it to compete" for opportunities set aside for such businesses). While being precluded from entering a bidding process may be irreparable harm, SCT has not been actually or effectively prevented from bidding on the Prospectus, as

already discussed.  The other cases that SCT cites involve parties seeking to enjoin a contract that had already been awarded—so the party had already undergone the tainted bidding process and that injury was not the one it sought to prevent.  See Ace-Federal Reporters, Inc. v. FERC, 732 F. Supp. 10, 11–12 (D.D.C. 1990) (party sought to enjoin performance of contract awarded to competitor).  They do not support the idea that absent a preliminary injunction, SCT will be irreparably injured by being forced to undergo a tainted bidding process.

SCT also suggests that it faces irreparable harm because it will go out of business if it fails to receive the contract.  While extensive business harm can constitute irreparable injury, the harm must be "*certain*, *great* and *actual*—not theoretical—and *imminent*" to so constitute.  Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Here, any such injury is speculative rather than actual or imminent.  SCT does not know for certain that it will not win the Prospectus bid (assuming it submitted a bid).  In light of the speculative nature of SCT's lost permit—and resulting loss of business—its injury is insufficient for purposes of irreparable harm.

### 2. *SCT does not demonstrate irreparable harm as to its NEPA claim.*

Similarly, SCT has failed to articulate an irreparable harm related to its NEPA claim that is likely to occur in the absence of a preliminary injunction.  Any procedural defect in the environmental analysis process that SCT identifies is, by itself, insufficient to constitute irreparable harm.  See, e.g., Brady Campaign to Prevent Gun Violence v. Salazar, 612 F. Supp. 2d 1, 24 (D.D.C. 2009); Fund for Animals v. Norton, 281 F. Supp. 2d 209, 222 (D.C. Cir. 2003) (citing Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987)).  While environmental and aesthetic harms can be irreparable, SCT points to no such concrete harms that will flow from the alleged NEPA violation here.  As discussed above, SCT fails to articulate concrete harms that

will follow from the potential removal of structures along the shuttle route that are irreparable—any economic harm from the need to remove or sell the facilities it constructed can clearly be remedied by damages for any lost value.  Instead, it notes in generalized terms that the Canyon's environment is fragile and home to endangered species.  It does not explain how either would be impacted by any removal of structures.  SCT therefore fails to articulate irreparable harm related to its NEPA claim that is likely to occur in the absence of a preliminary injunction.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for a Preliminary Injunction.  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>February 8, 2018</u>